## City of Burlington v. Associated Electric & Gas Insurance Services, Ltd.

[669 A.2d 1181]

No. 94-098

Present: **Gibson, Dooley, Morse and Johnson, JJ., and Peck, J. (Ret.), Specially Assigned**

Opinion Filed September 22, 1995

*John L. Franco, Jr.*, and *John T. Leddy* of *McNeil, Leddy & Sheahan*, Burlington, for Plaintiff-Appellant.

*Joseph E. Frank* of *Paul, Frank & Collins, Inc.*, Burlington, for Defendant-Appellee.

**Dooley, J.** This is a companion case to *City of Burlington v. National Union Fire Insurance Co.*, 163 Vt. 124, 655 A.2d 719 (1994) (hereinafter *NUFI*), in which we decided that the primary liability policy the City of Burlington had with National Union Fire Insurance Co. did not require the insurer to defend or indemnify the City in the case of *Moffatt v. City of Burlington*. Having settled the *Moffatt* litigation, the City seeks a summary judgment that Associated Electric & Gas Insurance Services, Ltd. (AEGIS), an excess liability carrier, must indemnify it for part of the settlement amount. Finding differences in the basic coverage of the respective policies involved in the companion cases, we reverse a Chittenden Superior Court decision that no coverage is extended by the AEGIS policy and remand for further proceedings.

The basic facts are set out in the following paragraph from *NUFI*:

> The issue on appeal is whether the allegations in the *Moffatt* complaint, sounding in breach of contract and related torts, triggered NUFI's duty to defend Burlington under the provisions of the occurrence-based liability insurance policies that NUFI issued to Burlington. The *Moffatt* suit contained five counts against the City of Burlington. All of the counts arose out of the operation of an electric generation plant owned by the Burlington Electric Department. The plant was fueled by wood chips supplied by plaintiffs, and plaintiffs alleged that Burlington refused to purchase the volume of wood chips called for in their contract. Count I alleged that Burlington breached its contract with plaintiffs. Count II alleged that Burlington knew its refusal to accept the quantity of wood chips contracted for was causing the plaintiffs devastating financial hardship, and had the character of a willful and wanton or fraudulent tort of insult and oppression. Count III alleged breach of duty of good faith and fair dealing under the wood chip contract. Count IV alleged economic duress in the administration of the wood chip contract, and Count V alleged deceit, claiming that Burlington failed to disclose correct information and misrepresented material facts. The

plaintiffs claimed bodily injuries including severe emotional distress, as well as economic losses, and asked for an award of direct, consequential, and punitive damages.

*NUFI*, 163 Vt. at 126, 655 A.2d at 720. After NUFI and AEGIS declined to defend or indemnify, *Moffatt* was settled for an undisclosed amount exceeding $100,000. The size of the settlement is relevant only in that AEGIS's excess liability coverage begins at $100,000 in damages. A part of the settlement was allocated to damages relating to personal injury, pain and suffering, and injuries to health.

The issue in *NUFI* was whether any of the five *Moffatt* counts alleged an "occurrence," the operative coverage term in the NUFI policy. The policy defined "occurrence" to mean an "accident . . . which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." *Id.* at 126–27, 655 A.2d at 720. Distinguishing cases where an intended act results in unintended damages or injury, we concluded that the facts underlying the *Moffatt* litigation showed that Burlington intended or expected economic injury to the wood chip suppliers when it reduced its purchases from them. *Id.* at 128–29, 655 A.2d at 721–22. We held that *Moffatt* was really a breach of contract action, although cast in tort language, and "we would distort the purpose of the liability insurance policy" if we found coverage for the *Moffatt* litigation. *Id.* at 130, 655 A.2d at 722–23. Thus, we found that plaintiffs' damages in *Moffatt* were not caused by an "occurrence" as defined in the NUFI policy, and NUFI had no duty to defend or indemnify.

Although there are some minor differences in the positions of the parties in this case, reflecting that AEGIS is an excess carrier, the parties have framed the same issue as in *NUFI*: whether the damages suffered by the plaintiff in *Moffatt* were caused by an occurrence, as defined in the relevant policy. The real difference in the cases lies in the content of the definition of "occurrence." The definitions in the policies are:

"Occurrence" is "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

"Occurrence" is "an accident, event or continuous or repeated exposure to conditions which result in bodily injury, personal injury or property damage."

There are two obvious differences in the definitions. The first is that the AEGIS policy has added the term "event" as a synonym for "occurrence." The second is that the phrase "neither expected nor intended from the standpoint of the insured" appears only in the NUFI policy language. The City argues that these differences both support coverage under the AEGIS policy and mean that our *NUFI* decision is not controlling. Not surprisingly, AEGIS, supported by the trial court, argues that *NUFI* controls despite the wording differences.

Both the summary judgment standard and our main rules on construing insurance contracts are set out in *NUFI* and do not need to be repeated here. See *id.* at 127–28, 655 A.2d at 721. We add only that where a disputed term in an insurance policy is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured. See *Garneau v. Curtis & Bedell, Inc.*, 158 Vt. 363, 367, 610 A.2d 132, 134 (1992). The reason for construing ambiguities against the insurer is a simple matter of fairness; insurers enjoy considerable expertise, and the insured generally has no voice in the preparation and drafting of the policy. See 2 G. Couch, Couch on Insurance § 15:78, at 383 (2d ed. 1984); see also *CPC Int'l v. Northbrook Excess & Surplus Ins.*, 962 F.2d 77, 88 (1st Cir. 1992) (ambiguities resolved against insurer because it is party that selected confusing language).

We recognize at the outset that much of the reasoning of *NUFI* applies here. As we emphasized in *NUFI*, requiring indemnification for what are essentially contractual claims normally lies outside of the realm of liability insurance and makes the carrier a business partner with the insured sharing, however, only in the losses. The risk is enormous, and, we have no doubt, virtually impossible to evaluate to establish a price for coverage.

On the other hand, an insurance policy is a consensual contract. If an insurance carrier makes a business decision to take on such an obligation, we must enforce it for the insured who is entitled

to the benefits of the bargain made. See 2 G. Couch, *supra*, § 15:10, at 153–54; see also *York Industrial Center, Inc. v. Michigan Mut. Liab. Co.*, 155 S.E.2d 501, 505 (N.C. 1967) ("occurrence" must be given meaning defined in policy, regardless of whether broader or narrower meaning is customarily given to term). Our duty is to construe the insurance policy as it is written, not to rewrite it on behalf of the parties. See *Medlar v. Aetna Ins. Co.*, 127 Vt. 337, 347, 248 A.2d 740, 747 (1968).

There is another relevant consideration. Insurance contracts are not individually drafted agreements, nor are they drafted in isolation from contracts of other carriers. The *NUFI* language comes from a standard industry model, as we noted sixteen years ago in *State v. Glens Falls Ins. Co.*, 137 Vt. 313, 315 n.1, 404 A.2d 101, 103 n.1 (1979); see also *Broadwell Realty Servs. v. Fidelity & Casualty Co. of N.Y.*, 528 A.2d 76, 84 (N.J. Super. Ct. 1987) (insurance industry developed standard occurrence-based liability policy which included definition of occurrence as in *NUFI*), *abrogated by Morton Int'l, Inc. v. Gen'l Acc. Ins. Co. of America*, 629 A.2d 831 (N.J. 1993); Rynearson, Exclusion of Expected or Intended Personal Injury or Property Damage Under the Occurrence Definition of the Standard Comprehensive General Liability Policy, 19 Forum 513, 513–14 (1984) (describing drafting history of "standard comprehensive general liability policy"). We can only assume that AEGIS has intentionally deviated from this model.

■ We agree with the City that the differences between the AEGIS and NUFI policy language are determinative. One dictionary defines "event" as "[s]omething that takes place" or "[t]he actual outcome or final result." Webster's II New Riverside University Dictionary 448 (1984). The American Heritage Dictionary defines "event" as "[a]n occurrence, incident, or experience, especially one of some significance." American Heritage Dictionary 454 (1979). Neither of these definitions suggests that the term "event" is limited to an action that is accidental or unintended. At best, the term is ambiguous, and this ambiguity must be resolved in favor of the insured. See *Garneau*, 158 Vt. at 367, 610 A.2d at 134. We conclude that the term "event" in the excess liability policy covers the claims raised in *Moffatt*, and that AEGIS had a duty to indemnify Burlington.

Our conclusion is reinforced by the fact that AEGIS has left out language covering occurrences only if they cause damages "neither expected nor intended from the standpoint of the insured." In general, insurance policies that include the word "event" in their definition of "occurrence" also include an express coverage limitation

regarding the intent or expectation of the insured. See, e.g., *CPC Int'l*, 962 F.2d at 83 n.5 ("Occurrence" defined as "an accident, event or happening . . . which results . . . [in injury] *neither expected nor intended from the standpoint of the Insured*") (emphasis added); *Diocese of Winona v. Interstate Fire & Casualty Co.*, 858 F. Supp. 1407, 1416 (D. Minn. 1994) ("occurrence" defined as "an accident, event, or happening that *'unexpectedly and unintentionally'* results in a loss") (emphasis added); *Hatco Corp. v. W.R. Grace & Co. — Conn*, 801 F. Supp. 1334, 1351 (D.N.J. 1992) ("occurrence" defined as "an accident, event or continuous or repeated exposure to conditions which result . . . in injury . . . which is *accidentally* caused") (emphasis added). The omission of this standard phrase reinforces that coverage extends beyond accidental occurrences.

This decision does not fully resolve the controversy because AEGIS also relies on certain policy exclusions that were not addressed by the trial court. Although the City would have us address those provisions, we decline to do so because they should first be construed and applied by the trial court.

*Reversed and remanded.*