## James L. Ulm v. Ford Motor Company and Kaiser Foundation Health Plan of Massachusetts, Inc.

[750 A.2d 981]

No. 97-308

Present: Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.

Opinion Filed January 7, 2000

*Michael F. Hanley* and *Barney L. Brannen* of *Plante, Hanley & Brannen, P.C.*, White River Junction, for Plaintiff-Appellee.

*John J. Boylan* of *Boylan & Bowen,* Springfield, *Wendy F. Lumish* of *Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A.,* Miami, Florida, and *James M. Campbell* and *Kurt B. Gerstner* of *Campbell Campbell & Edwards,* Boston, Massachusetts, for Defendant-Appellant Ford Motor Co.

*Neal D. Ferenc,* Moretown, for Intervenor-Appellant Kaiser Foundation Health Plan of Massachusetts, Inc.

**Amestoy, C.J.** Defendant Ford Motor Company appeals from a Windham Superior Court jury verdict awarding plaintiff James Ulm $1.25 million for injuries he sustained as a passenger in a Ford Bronco where the claimed cause of injury was a defective steering system. On appeal, defendant argues that (1) the court erred in denying defendant's motion for judgment as a matter of law because plaintiff failed to establish that the alleged defect caused plaintiff's injuries; (2) the court erred in excluding evidence that plaintiff was not wearing a safety belt when the accident occurred; (3) the court abused its discretion in allowing plaintiff to introduce into evidence or to use in cross-examination references to other incidents of sector-shaft failure without a showing of substantial similarity, and the evidence was either irrelevant or unfairly prejudicial; (4) defendant was unfairly prejudiced by the manner in which excited utterances were admitted and emphasized by both plaintiff and the court; and (5) the court erred in allowing prejudgment interest after the jury rendered a general verdict. In this appeal, we also address intervenor Kaiser Foundation Health Plan of Massachusetts' (Kaiser) appeal of the superior court's decision dismissing Kaiser's claim for subrogation rights. We affirm the decision in all respects.

Facts introduced at trial established that on September 9, 1990, after spending the day boating on the Harriman Reservoir in Wilmington, plaintiff and friend Gary Corey left the reservoir boat landing in a 1978 Ford Bronco, owned by friend Chris Wood. Corey drove the Bronco along the dirt road leading to his cottage at a speed of approximately twenty to twenty-five miles per hour. As the vehicle approached a curve in the road, Corey lost control of the steering. The vehicle went off the road, climbed an embankment, struck a tree, and rolled over onto its passenger side. Plaintiff broke his back and sustained a spinal cord injury that paralyzed him from the waist down. Plaintiff brought a strict liability action against Ford, alleging that defective design in the 1978 Ford Bronco steering system caused the steering gear sector shaft to break at some point prior to the accident, causing the loss of steering control which led to the accident.

The jury awarded $1,250,000 in damages, of which $260,000 was allocated to emotional distress damages. Post-trial, plaintiff sought prejudgment interest based on the total past economic losses to which his economist had testified. After adjustments for pretrial settlements and prejudgment interest, the court entered judgment for plaintiff in the amount of $1,290,460.52.

## I. Defendant's Motion for Judgment as a Matter of Law

### A. Defendant's Failure to Renew Motion for Judgment as a Matter of Law

We first address defendant's argument that the court erred in denying its motion for judgment as a matter of law. Although defendant moved for judgment as a matter of law at the close of plaintiff's case, it failed to renew the motion at the close of the evidence as V.R.C.P. 50(b) requires. Defendant argues that plaintiff introduced no evidence after defendant made its motion and urges a more flexible interpretation of the renewal requirement, in accordance with the federal approach to the rule. See *Greenwood v. Societe Francaise De*, 111 F.3d 1239, 1244 (5th Cir. 1997) (courts have "excused technical noncompliance [with Rule 50(b)] where the purposes of the requirement have been satisfied"). It also argues that where a defendant moves for judgment as a matter of law at the close of a plaintiff's case, and then objects to a jury charge on the same grounds, the objection to the jury charge suffices as a renewal of the original motion. See *id.* at 1245.

■ Contrary to federal interpretation, we have "construed [Rule 50] strictly and held that even where a motion for directed verdict was made at the end of plaintiff's case, if not renewed at the close of all evidence as required by V.R.C.P. 50(b), the issues are waived." *Lent v. Huntoon*, 143 Vt. 539, 551, 470 A.2d 1162, 1170-71 (1983). Moreover, after defendant made its motion, plaintiff did introduce additional evidence: a Ford memorandum in which one Ford representative concluded that "[i]t is probable that these sector failures are a result of an impact after which the customer did not recognize . . . a problem until complete failure." In its reply brief, defendant qualifies its initial argument that plaintiff introduced no evidence after defendant's motion, arguing instead that plaintiff introduced no *new* evidence after defendant's motion. Regardless, we conclude that "[r]enewal of the motion is necessary to appeal from a denial of or a failure to grant a motion for judgment as a matter of law." V.R.C.P. 50(b).

## B. Verdict Supported by Evidence

Even within a strict application of the renewal requirement, defendant argues that a failure to renew a V.R.C.P. 50(b) motion should be excused where "manifest injustice" will otherwise occur. See *Doctor's Assocs. v. Weible*, 92 F.3d 108, 113-14 (2d Cir. 1996). In *Weible*, the court relieved the moving party from the requirements of F.R.C.P. 50 because relief was necessary to avoid the manifest injustice of a jury verdict wholly without legal support. See *id.* (citing *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54-55 (2d Cir. 1978) ("Where a jury's verdict is wholly without legal support, we will order a new trial in order to prevent a manifest injustice.").

Plaintiff's theory of the case was that the steering gear sector shaft in the subject Bronco fractured and severed, causing a loss of steering control and leading to the accident. Plaintiff alleged that the defect resulted from Ford's rush to design a four-wheel vehicle to compete with the popular Chevy Blazer. Plaintiff argued that Ford compressed the time usually required to design and develop a sport utility vehicle — in this case, the new Bronco — in 1978. As a result, many parts and systems for the Bronco were taken from Ford's existing vehicles, including the entire steering system, which was taken from a Ford pick-up truck and was significantly different from the system used in the older model Bronco. The effects of this steering system change were never tested in the new Bronco. According to plaintiff, Ford soon began experiencing problems with the steering systems in its new four-wheel drive vehicles. Specifically, the steering gear sector shafts would occasionally fracture, disconnecting the steering wheel from the front wheels of the vehicle. In several memoranda detailing laboratory test data, Ford acknowledged the problem but indicated that a sector shaft would not break all the way through with a stress load of less than 40,000 inch-pounds of torque. The highest recorded load from Ford's own road testing was 27,000 inch-pounds; thus, Ford's engineers concluded that sector shafts could not have been fractured by "normal" usage, but only by extraordinary abuse. Plaintiff, however, alleged that a fracture could be *initiated* at much lower loads. At trial, plaintiff argued that the Bronco steering system was defectively designed such that, prior to the accident, a stress event initiated a fracture in the subject Bronco's sector shaft. Once the fracture was started, a series of progressively smaller, less remarkable impacts completed the fracture, resulting in the loss of steering control that caused the accident.

Defendant argues that plaintiff's expert on design defect and causation, Professor Hochgraf, based his opinion on speculation as to

the events that caused the sector shaft failure and that, in fact, the evidence affirmatively demonstrated that the vehicle had not experienced a stress event of the type described by Hochgraf. Hochgraf testified that the prerequisite for a sector shaft failure was a load event in the range of 37,000 inch pounds followed by up to twenty additional loads of declining but significant strength. Ford claims that the evidence adduced at trial, however, revealed that the subject Bronco's sector shaft was replaced in 1990, that only Wood and Corey had driven the vehicle since the sector shaft replacement, and that their usage was minimal and normal, involving neither off-road driving nor a significant loading event.

Although neither Wood nor Corey recalled any significant impact event while driving the Bronco, plaintiff's expert testified that the impact necessary to cause the initial crack could be unremarkable to a driver, particularly given the fact that the vehicle was used on dirt roads. Indeed, Corey and several other plaintiff's witnesses testified that the roads the Bronco repeatedly traveled upon were rutted, pot-holed, and generally ·very rough. Defendant seems to tacitly concede this point in its reply brief, suggesting that ruts in the road may have been so significant that the Bronco, despite Corey's attempt to turn the wheel to the left, remained firmly stuck in a rut. Thus, despite the fact that the Bronco was not used for off-road driving, several of plaintiff's witnesses testified that the vehicle was used repeatedly on rutted, pot-holed, and rough roads. Consistent with plaintiff's expert's testimony, William Daley, a witness who was at the scene immediately after the accident, testified that the driver, Corey, told him that "he turned the wheel and it just, the vehicle did whatever it wanted, couldn't control it . . . the vehicle just went out of control." Although defendant argues that this statement is ambiguous and could just as easily describe a tire getting caught in a rut, Ford experts agreed at trial that a sector-shaft failure would leave the driver with a free-playing steering wheel and no control over the vehicle's wheels.

■ The evidence produced at trial sufficiently supports plaintiff's claim that the defect in the 1978 Ford Bronco steering-system design caused the subject steering sector shaft to initially fracture and eventually sever, leading to the accident that resulted in plaintiff's injuries and paralysis. Plaintiff's ample and persuasive evidence of causation, as discussed below, "permits no such conclusion of [manifest] injustice." *Baskin v. Hawley*, 807 F.2d 1120, 1130 (2d Cir. 1986).

Thus, the court did not err in denying Ford's motion for judgment as a matter of law.

## II. Plaintiff's Failure to Wear a Safety Belt

We next address defendant's argument that the trial court erred in excluding evidence of plaintiff's failure to wear a safety belt. Defendant asserts that (1) plaintiff's failure to wear a safety belt was the proximate cause of his injuries, and (2) plaintiff's failure to wear a safety belt was admissible to establish his comparative fault.

Title 23 V.S.A. § 1259(a) imposes a fine on the operator of a motor vehicle if any person is occupying a seat that has a federally approved safety belt system and is not restrained by the safety belt while the vehicle is in motion on a public highway. The statute also contains evidentiary components that provide:

> (d) Noncompliance with the provisions of this section shall not be admissible as evidence in any civil proceeding.

> (e) Failure to wear a safety belt in violation of this section shall not constitute negligence or contributory negligence in any civil proceeding or criminal action, nor be entered as evidence to bar prosecution of a criminal offense.

*Id.* § 1259(d), (e). When questioned at oral argument regarding the statute's applicability, defense counsel argued that, because the statute was not effective until January 1, 1994, it did not apply. The statute became effective approximately five months after the complaint was filed, but more than three years before the case went to trial.

Although new statutes generally do not apply to cases that are pending at the time of their effective date, there is an exception for statutes that are solely procedural or are remedial in nature. See *Myott v. Myott*, 149 Vt. 573, 575, 547 A.2d 1336, 1338 (1988). The question of the applicability of a new statute to pending litigation is determined largely by 1 V.S.A. §§ 213 and 214(b). See *id.* at 575-76, 547 A.2d at 1338. Section 213 provides:

> Acts of the general assembly, *except acts regulating practice in court*, relating to the competency of witnesses or to amendments of process or pleadings, shall not affect a suit begun or pending at the time of their passage.

1 V.S.A. § 213 (emphasis added). The subsections of the safety belt statute at issue prohibit the admissibility of a particular type of

evidence, thereby regulating practice in court. Because the provisions within § 1259 that are at issue in this case are procedural rather than substantive, they fall within § 213's exception and apply to the instant case.

Defendant argues that the statute only prohibits references to the fact that the safety belt statute has been *violated*. Section 1259(d), however, prohibits the introduction of evidence of *noncompliance* with the safety belt statute in a civil proceeding. Failure to wear a safety belt is the most obvious example of noncompliance with the statute, and we presume the Legislature chose the word "noncompliance" advisedly. See *Payea v. Howard Bank*, 164 Vt. 106, 107, 663 A.2d 937, 938 (1995) ("When construing a statute, we presume that language is inserted advisedly.").

■ Ford contends that even if the statute can be read as prohibiting the introduction of the plaintiff's failure to wear a safety belt on the issue of comparative fault, the failure to wear a safety belt is admissible on defendant's theory that it was the sole proximate cause of plaintiff's injury. We construe 23 V.S.A. § 1259(d), however, as prohibiting the introduction of evidence of a failure to wear a safety belt in a civil proceeding irrespective of the legal theory advanced by a party. Thus, the court did not err in excluding this evidence.

### III. Evidence Used in Cross-Examination

Ford next argues that the court abused its discretion in allowing plaintiff to introduce into evidence or to use in cross-examination references to other incidents of sector-shaft failure without a showing of substantial similarity. In the alternative, Ford contends that even if substantially similar, evidence of other incidents was not relevant. Finally, Ford asserts that even if plaintiff has demonstrated relevancy, evidence of other sector-shaft failures should have been excluded under V.R.E. 403 because the unfair prejudice to Ford substantially outweighed its probative value. Unless we determine that the trial court abused its discretion in admitting evidence of other accidents involving steering-sector fractures, we will not disturb the court's rulings. See *Mobbs v. Central Vermont Ry.*, 155 Vt. 210, 226, 583 A.2d 566, 575 (1990) (rulings on similarity of accidents lie within trial court's discretion).

Defendant objects to plaintiff's use of seven Ford documents in the cross-examination of Ford's metallurgist. Exhibit 605 (entitled "4 x 4 Sector Failures") and Exhibit 610 (entitled "Broken Sector Shaft

Problem") were admitted into evidence. Exhibits 630 through 634 were individual reports summarizing the results of Ford engineering investigations into complaints of accidents alleging loss of steering control. Plaintiff made reference to these latter documents during cross-examination, but they were not admitted into evidence.

At trial, Ford objected to the introduction of Exhibit 605 "on foundation grounds." On appeal, defendant amplifies its objection contending that the court's failure to consider road conditions, prior condition of the sector shafts, abuse by prior drivers, and evidence as to the loading that the vehicle had experienced, made it error as a matter of law to admit the exhibit. We disagree. Plaintiff established that the seven incidents referenced in Exhibit 605 involved Ford vehicles with steering systems identical to the 1978 Bronco. Moreover, Exhibit 605 was relevant to the theory advanced by plaintiff's expert that a driver could be unaware of the impact causing the initial crack in the sector shaft. The Ford memorandum notes: "It is probable that these sector failures are a result of impact after which the customer did not recognize . . . a problem until complete failure." Exhibit 605 was relevant and properly admitted by the court as a business record under V.R.E. 803(6).

Similarly, defendant's objection to the introduction of Exhibit 610 fails to demonstrate that the court abused its discretion in allowing admission of the document. The internal Ford document — again admissible as a business record — contains data "on fractured sector shafts returned from the field" and recommendations to "define and correct this problem." Admission of the document was well within the discretion of the court.

Ford also objects to plaintiff's use, again during cross-examination of Ford's metallurgist, of five memoranda prepared by Ford employees. These memoranda document the results of investigations into five individual instances of sector-shaft failures on 1978 and 1979 Broncos and F-150s performed by Ford's power-steering-gear department. Plaintiff posed the following question to Ford's witness:

> Would you agree with me, sir, that the general characterization of Ford's approach to investigating those accidents was that this sector shaft could not have fractured under any kind of ordinary or even severe road usage, therefore, it must not have fractured under such usage?

Ford's witness replied, "No, I would not agree."

■ Plaintiff then sought to use Exhibits 630 through 634 to impeach Ford's witness. Defendant objected that plaintiff's purpose was irrelevant to the issues being decided. The court determined that the exhibits were relevant to impeach the witness' testimony. Ford on appeal provides more explanation for its claim of irrelevancy than it did for the trial court, but falls far short of a showing of any error below. Ford argues that without proof of how the other accidents referenced in the exhibits occurred, the evidence could not impeach its expert's opinions. Plaintiff's purpose in impeachment, however, was to bolster his theory of the case that Ford's engineers repeatedly assumed that the sector-shaft failures could only occur in an abnormal single event. Each of the memoranda documenting the results of Ford's engineering investigations into complaints of loss of steering control ended with the identical conclusion: "Since this problem is a result of an overload condition and not a design manufacturing problem, Steering Gear Engineering recommends this problem be closed." Each memoranda dealt with steering control mechanisms identical to those in a 1978 Bronco. The court's determination that Exhibits 630 through 634 contained relevant evidence was sound. Evidence is admissible if relevant, and relevant if it has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable. See V.R.E. 401; *Ball v. Melsur Corp.*, 161 Vt. 35, 42, 633 A.2d 705, 711 (1993).

■ Defendant's alternative argument that the evidence, even if relevant, was inadmissible under V.R.E. 403 is unavailing. The court has broad discretion in determining whether the probative value of relevant evidence outweighs any prejudicial effect. See *State v. Wheel*, 155 Vt. 587, 604, 587 A.2d 933, 944 (1990). The burden of showing abuse of discretion is a heavy one. See *Quirion v. Forcier*, 161 Vt. 15, 21, 632 A.2d 365, 369 (1993). That burden has not been met here.

## IV. Excited Utterances

We next address defendant's argument that the manner in which excited utterances were explained and emphasized by plaintiff in his closing argument, and then by the court in its curative instruction, unfairly prejudiced defendant. During trial, plaintiff elicited testimony from witness Daley that, at the scene, driver Corey told him the steering wheel "felt like it was disconnected." Plaintiff also elicited testimony from another witness, William Johnson, that while still trapped in the vehicle, plaintiff said the accident "was not [Corey's] fault." During his closing, plaintiff's counsel explained:

[T]hese are what lawyers call excited utterances.

You heard that phrase used during this trial. Excited utterances. Excited utterances are given a special place in our legal system. The view about excited utterances is, that because they are spontaneous, they are entitled to special consideration when you evaluate the evidence.

Ford did not object to these statements at the time of argument, but instead attempted to argue during its closing that plaintiff's statement that excited utterances should receive special consideration was an incorrect statement of the law. Ford then requested a curative instruction, which the court provided:

And when the Court invokes the [excited utterances] doctrine and allows it as an exception to the hearsay rule, it is because the trustworthiness of the reliability of the statement itself is couched in the surrounding circumstances and, therefore, the statement would tend to be made without reflection or thought or just a statement under those particular circumstances. Those excited utterances are treated equally with all of the evidence allowed in the case by the Court. You should understand that you may consider that statement along with all of the other evidence in making an assessment . . . in this case.

■■ Defendant now argues that this supplemental charge only heightened the significance of the testimony and thus unfairly prejudiced Ford. We disagree for two reasons. First, the court's instruction provided a correct statement of the law, see V.R.E. 803(2); Reporter's Notes V.R.E. 803 (Rule 803(2) among rules that "deal with out-of-court statements made in circumstances of spontaneity that supply the necessary element of trustworthiness"), and sufficiently countered the effect of statements made by plaintiff's counsel. See *Deyo v. Kinley*, 152 Vt. 196, 203, 565 A.2d 1286, 1290 (1989) (court's curative instruction served adequately to cure alleged error in plaintiffs' counsel's closing argument). No error was committed by the court in its supplemental charge to the jury. Second, Ford failed to object to the supplemental charge given by the trial court. Where a party objects to a court's charge and the jury receives supplemental instructions, the party must object to the supplemental instruction in order to preserve the claim on appeal. See *Nelson v. Percy*, 149 Vt. 168, 170, 540 A.2d 1035, 1036 (1987). Indeed, by its silence, defendant

"appeared to accept the court's response to the objection." See *Deyo*, 152 Vt. at 203, 565 A.2d at 1291.

## V. Prejudgment Interest

Finally, we address defendant's argument that, where hard and soft damage amounts are lumped together in a general verdict without a breakdown by category, prejudgment interest should not be awarded. During the jury charge conference, the court asked counsel whether it should instruct the jury concerning prejudgment interest. Plaintiff stated that the court should calculate the interest on those damages that were capable of being reduced to an ascertainable sum (hard damages), but not on inchoate damages (soft damages). The colloquy proceeded as follows:

> Plaintiff's Counsel: We think the court should do it. We were very careful . . . to distinguish between the hard damages and the soft damages. And, so, we think this is a calculation the court can do, and I think the court should tell the jury that they need not concern themselves with interest.

> Defense Counsel: Yeah, the only question would be if there is going to be some sort of breakdown that separates the hard damages and the other damages, so there is a way of calculating [interest].

> Plaintiff's Counsel: We think the Court can do that based upon the evidence Your Honor. . . .

> Court: Well, in the past I have had the parties agree the court will advise the jury that they need not concern themselves with fixed damages according to the evidence such as hospital and medical expense, loss of income, cost offered by your expert as to necessary equipment this gentleman would require in the future . . . . I think that's all hard evidence and can be distinguished from soft damages . . . .

There was no further discussion regarding breaking down hard and soft damages, and defense counsel did not raise the issue again. Later in the discussion, the following colloquy occurred:

> Court: All right. So, the plaintiff would . . . agree to the charge, "You should not concern yourself with interest,

cost or attorney fees in calculating damages. The proper effect of those matters on the amount of the judgment is a matter for the court to decide." Is that agreeable to the defendant?

Defense Counsel: Yes, Your Honor, that would be fine.

The jury verdict form did not separate hard and soft damages, except that it asked what portion of the total award was included for emotional distress. After the trial, plaintiff requested prejudgment interest based on the total post-economic losses to which his expert had testified. Defendant opposed the motion, arguing that, because the jury did not separate the hard economic losses from the new inchoate losses, the court was left to speculate as to exactly what the jury awarded other than with regard to the emotional distress claim. The court granted plaintiff's request for prejudgment interest in the amount of $150,290. This amount was calculated based on plaintiff's expert's testimony regarding plaintiff's past economic loss from the date of the accident to the date the jury returned its verdict, at an interest rate of twelve percent.

Defendant claims that plaintiff made the affirmative decision that a general verdict form should be used even after Ford pointed out that a breakdown of the damage elements was required. As such, plaintiff failed to meet his burden of establishing the hard damages to which interest would attach. Even if a breakdown was not required, defendant argues, there was no basis to conclude that the jury must have awarded plaintiff all of the economic damages claimed by plaintiff. Defendant argues that, since it challenged plaintiff's expert testimony on his past lost earnings and past medical and life-care expenses, there is no way of ascertaining whether the jury accepted or rejected any or all of the expert's testimony.

■ We have previously held that the question of interest on reasonably ascertainable damages is not properly within the discretion of the fact finder. See *Remes v. Nordic Group, Inc.*, 169 Vt. 37, 39, 726 A.2d 77, 78-79 (1999). We also clarified, however, that the rule does not encompass certain damage elements of personal injury actions such as pain and suffering and permanent impairment where damages are inchoate and rarely ascertainable at the time of injury. See *Estate of Fleming v. Nicholson*, 168 Vt. 495, 501, 724 A.2d 1026, 1030 (1998); *d'Arc Turcotte v. Estate of LaRose*, 153 Vt. 196, 200 n.2, 569 A.2d 1086, 1088 n.2 (1989). In *Gilman v. Towmotor Corp.*, 160 Vt. 116, 621 A.2d 1260 (1992), we agreed with the defendant's argument on

appeal that the jury's failure to break down past damages according to type and date incurred gave plaintiff "windfall" interest. See *id.* at 121, 621 A.2d at 1263. Nonetheless, because Ford failed to object to the instruction or interrogatories on this point, and "it was understood at trial that interest would be calculated on the past damages found by the jury," the defendant's objection was waived. *Id.* at 122, 621 A.2d at 1263 (citing *Hartnett v. Union Mut. Fire Ins. Co.*, 153 Vt. 152, 160, 569 A.2d 486, 490 (1989) (failure to object to portion of instruction on damages precludes review on appeal)). Accordingly, we affirm the award of prejudgment interest.

## VI. Subrogation Rights Claim

In July 1994, Kaiser Foundation Health Plan of Massachusetts, plaintiff's health insurance provider, filed a motion to intervene with the superior court, asserting its subrogation rights in plaintiff's lawsuit against Ford and other defendants. Plaintiff's subsequent summary judgment motion was granted by the court in an August 1995 ruling which held that the subject policy gave Kaiser only a right to reimbursement after recovery, not an equitable subrogation right. Kaiser now appeals that ruling. We affirm the court's dismissal.

We review a motion for summary judgment under the same standard as the trial court: summary judgment is appropriate only when the record clearly shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. See V.R.C.P. 56(c); *Bacon v. Lascelles*, 165 Vt. 214, 218, 678 A.2d 902, 905 (1996). In making this determination, we regard as true all allegations of the nonmoving party that are supported by admissible evidence, and we also give the nonmoving party the benefit of all reasonable doubts and inferences. See *Messier v. Metropolitan Life Ins. Co.*, 154 Vt. 406, 409, 578 A.2d 98, 99-100 (1990).

Kaiser's first argument is that the policy's language creates a right of subrogation, thereby granting the insurer the right to intervene in this lawsuit. The language at issue, appearing under the heading "Third Party Liability/Motor Vehicle Insurance Recoveries," reads:

> Sometimes we will provide or arrange health services when you have a legal right against a person, organization or insurer to recover for those services. This may happen, for example, if you are in an automobile accident or have a job-related injury. It may also happen if you are injured and another party is legally responsible. If an injury or

illness is caused by a third party or in an accident covered by motor vehicle insurance, you must reimburse Health Plan for services or benefits you receive as a result of the injury or illness, *or* allow us to recover directly from the third party insurer. Even if the payment by the third party or insurer is less than the full amount of your damages, Health Plan has a right to be reimbursed for the services it provided or paid for. Our recovery can be no more than the fee-for-service cost of these services.

(Emphasis added.)

■ An insurance policy must be construed according to its terms and the evident intent of the parties as expressed in the policy language. See *Northern Security Ins. Co. v. Hatch*, 165 Vt. 383, 385-86, 683 A.2d 392, 394 (1996). Disputed terms should be read according to their plain, ordinary and popular meaning. See *American Protection Ins. Co. v. McMahan*, 151 Vt. 520, 522, 562 A.2d 462, 464 (1989). Where a disputed term in an insurance policy is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured. See *City of Burlington v. Associated Elec. & Gas Ins. Servs.*, 164 Vt. 218, 221, 669 A.2d 1181, 1183 (1995).

Here, the policy's language does not explicitly provide a right of subrogation for Kaiser. While the conjunction "or" between the clear reimbursement right and the direct recovery provision indicates that there is an option available, the policy does not clearly assign the right to exercise that option to the insurer, an opportunity to which Kaiser easily could have availed itself in drafting the policy. See, e.g., *Lopez v. Concord Gen. Mut. Ins. Group*, 155 Vt. 320, 324, 583 A.2d 602, 605 (1990) (as condition of obtaining medical payments benefits from automobile insurance policy, insured signed "proof of loss" form, which included following language: "I (we) hereby subrogate the said Company to all rights and causes of action I (we) have against any person, persons or corporation whomsoever for the above listed claim for services arising out of or incident to said accident."). Despite Kaiser's arguments to the contrary, if any inference at all can be drawn from the direct recovery language here, it is that the option belongs to the insured who may "allow" Kaiser to subrogate if the insured chooses not to sue the third party himself. As the superior court observed in its summary judgment ruling, the "[p]olicy provision in question merely creates a right of reimbursement after

recovery or right to allow insurer to recover. The latter does not ripen until plaintiff has elected to do so."

Nor are we persuaded that the language of the policy at issue and the facts of this case compel the application of the doctrine of equitable subrogation. See *Norfolk & Dedham Fire Ins. Co. v. Aetna Casualty & Surety Co.*, 132 Vt. 341, 344, 318 A.2d 659, 661 (1974) ("Subrogation is an equity creature akin to and derived from the law of unjust enrichment and restitution."). This doctrine permits an insurer to be subrogated to the claims of its insured, even if the policy lacks an express provision reserving such a right. See *id.* The doctrine's purpose is "purely equitable." *Kusserow v. Blue Cross-Blue Shield*, 140 Vt. 328, 334, 437 A.2d 1114, 1118 (1981).

■ Plaintiff in this case — unlike the insured in *Kusserow* — has acknowledged his legal obligation to reimburse the insurer for the medical expenses paid on behalf of the plaintiff. Insurer in this case — unlike the insurer in *Kusserow* — cannot point to a plain and unambiguous subrogation clause. See *id.* at 331, 437 A.2d at 1116 (subrogation provision read that "No Benefits Shall Be Provided . . . unless and until the [insured] shall in writing grant [the insurer] an assignment of his right of recovery equal to the amount of benefits to be paid him hereunder in connection with injuries . . . ."). The equitable purpose of subrogation is not served when, as here, neither the actions of the insured nor the policy of the insurer require judicial recognition of a right of subrogation. We decline to recognize such a right for Kaiser.

*Affirmed.*