CITY OF BURLINGTON, Plaintiff,

v.

HARTFORD STEAM BOILER INSPECTION AND INSURANCE COMPANY, Factory Mutual Insurance Company, Indemnity Insurance Company of North America, the Home Insurance Company, and Allianz Insurance Company, Defendants.

No. 1:00–CV–170.

United States District Court, D. Vermont.

March 6, 2002.

William F. Ellis, Esq., McNeil, Leddy & Sheahan, P.C., Burlington, VT, for Plaintiff.

Kathleen D. Monnes, Esq., Day, Berry & Howard, Hartford, CT, James W. Spink, Esq., Spink & Miller, PLC, Burlington, VT, Samuel Hoar, Jr., Esq., Dinse, Knapp & McAndrew, P.C., Burlington, VT, Stephen L. Coco, Esq., Robins, Kaplan, Miller & Ciresi, Boston, MA, Andrew S. Granzow, Esq., Hecker, Brown, Sherry & Johnson, Philadelphia, PA, Bret P. Powell, Esq., Unsworth & Barra, PLC, Essex Jct., VT, Douglas C. Pierson, Esq., Pierson, Wadhams, Quinn & Yates, Burlington, VT, for Defendants.

## OPINION AND ORDER

(Papers 90 & 122; 92 & 124; 119 & 141; 137 & 166; 130 & 153)

MURTHA, Chief Judge.

Plaintiff, City of Burlington, Vermont ("the City"), brings a breach of contract claim against five insurance companies seeking declaratory judgment. The City alleges that the companies have failed to reimburse the City for repair costs and consequential damages resulting from physical damage experienced in the boiler unit of a City-owned electric energy generating facility. The Defendants—Factory Mutual Insurance Company ("Factory Mutual"), Allianz Insurance Company ("Allianz"), The Home Insurance Company ("HIC"), Indemnity Insurance Company of North America ("Indemnity"), and Hartford Steam Boiler Inspection and Insurance Company ("Hartford")—each move for summary judgment on all respective counts,[1] and the City files cross-motions for summary judgment against each Defendant.[2] For the reasons set forth below, the Court GRANTS all of the Defendants' motions, and DENIES all of the City's motions.

### I. Background

#### A. The Faulty Shop Welds

In 1982, the City contracted with Zurn Industries, Inc. ("Zurn"), to design, engineer, and construct a wood-fired steam electric energy generator to be installed at the newly-constructed Joseph C. McNeil Generating Station in Burlington, Vermont. The boiler portion of the generator includes an economizer which consists of metal tubes welded together.[3] The welds are appropriately called "shop welds" since they are performed at a shop or manufacturing facility on a piece of equipment

---

1. Count I of the City's Amended Complaint (Paper 8) seeks declaratory judgment against all Defendants. Count II alleges breach of contract against Defendants Factory Mutual and Hartford. Count III alleges a claim of bad faith against Hartford.

2. The City seeks only partial summary judgment on the counts of declaratory judgment

and breach of contract against Hartford. *See* Paper 153.

3. The economizer tubes function by capturing thermal energy from flue gas on the outside of the tubes and transferring the energy to water stored inside the tubes.

prior to it being shipped and installed. The shop welds were made by Zurn at its manufacturing facility between April and August of 1982, and the completed economizers were later delivered and installed at the McNeil Station.

On April 20, 1983, pursuant to the City's contract with Zurn and in accordance with standards set by the American Society of Mechanical Engineers ("ASME") Boiler Code, the newly installed boiler was hydrostatically tested. *See* Paper 167, Ex. 13. Because none of the boiler welds showed leaks, the City concluded that the test was "an unqualified success." *Id.* The generator first began operating in March of 1984.

During 1987 and 1988, the City requested maintenance on the boiler due to the discovery of two isolated leaks in the lower section of the economizer. Though maintenance reports prepared following the weld repairs indicated that the two leaks were found at the shop welds, the welding contractors did not conclude that the leaks were caused by pervasive manufacturing defects. *See* Paper 95, Exs. L & M; Paper 165, Ex. F, at 32. Nor did the City, during that time, know the underlying cause of the two weld leaks. *See* Paper 165, Ex. F, at 33–34. In the opinion of the City's own metallurgical expert, the limited number of weld leaks occurring during the late 1980's would not have raised a reasonable suspicion that pervasive manufacturing defects were the cause of the damage experienced in the welds. *See* Paper 95, Ex. N, at ¶¶ 6–7. After 1988, no weld failures were discovered until April of 1995. Between April 1995 and August 1999, more than 30 leaks were discovered and repaired in the lower economizer section of the boiler unit by City-hired welding contractors. *See* Paper 95, Ex. K, at 18–19.

There is no evidence that during the course of these repairs—which typically included some inspection of the failed welds by certified welding contractors hired by the City—the City learned the underlying cause of the weld failures. By the winter of 1998, because of an increase in weld failures, the City became concerned that the failures were out of the ordinary. *See* Paper 167, Ex. 14, at 67–68.

The City therefore hired David N. French ("French") to study the economizer and determine the cause of the leaks. French performed a radiographic/metallographic analysis on two weld samples that had been cut out and removed from the lower section of the economizer by welding contractors during a planned plant shut down. *See* Paper 95, Ex. J, at 1–2.

In March of 1999, French completed an expert report containing the following conclusions:

> The original circumferential weld is generally of poor quality. There is a lack of full penetration which means the weld does not comply with ASME Boiler Code requirements. However, the weld metal itself is sound. Water-side pitting and corrosion are trivial with the deepest pits noted less than 4 mils deep.

*Id.* at 1.

Also in March of 1999, another City contractor, Power Specialist Associates, Inc. ("PSA"), performed ultrasonic thickness testing using immersion technology on selected areas of the economizer. PSA's report, dated March 14, 1999, concluded that:

> All of the tubes tested during this outage appeared to be in good condition. Tube failures were reported by plant personnel to be in the butt welds attaching the bend to the straight section of the tube. Upon visual inspection of the bends, it *appeared* that the failure was caused by a lack of root weld pen-

etration, which would cause a relatively weak area in the tube.

Paper 95, Ex. J (emphasis added).

In October of 1999, having previously sought only to repair weld leaks as they were found, the City contracted with Bremco, Inc. to remove and replace all existing shop welds in the lower section of the economizer, including those that had shown no signs of leaking. In a report dated December 16, 1999, Bremco made the following finding:

> Careful inspection of the removed welds revealed incomplete penetration at every joint. . . . The starting and stopping point of each arc in the welded joint root exhibited concavity. This is called "suck back" and as the name implies, the root is pulled back into the joint. When joints are fashioned in this manner, it will lead to premature failure as the wall thickness is drastically reduced. Common internal corrosion, coupled with a reduced wall thickness and root contamination for the arc strike in the beginning of the weld has set the stage for tube wall leaks.

*Id.*

In the spring of 2000, the City contracted with Vermont Nondestructive Testing ("VNT") to perform a radiographic inspection of the center and upper tube banks of the economizer. VNT's conclusion, dated April 10, 2000, stated as follows:

> Upper Economizer Radiograph 36 is acceptable, however, 1–35 and 37 were found to have inadequate penetration at the root. Center Economizer Radiograph 19, 35 and 36 are acceptable, however, 1–18, 2–24 and 37 were found to have inadequate penetration at the root.

Paper 95, Ex. O.

On November 1, 2000, the City submitted to the Defendants another report by French, dated March 28, 2000, in compliance with its duty to disclose the bases for the opinion of its expert under Federal Rule of Civil Procedure 26(a)(2). *See* Paper 95, Ex. J. Citing the previous French report, the PSA report, the Bremco report, as well as visual inspection of additional removed weld samples from the lower economizer, this second French Report concluded:

> The shop welds in the economizer do not meet the ASME code requirements for such welds. The economizer leaks were only at the welds, and the poor quality and lack of full penetration at the root are the fundamental cause of the many leaks.

Paper 95, Ex. J.

Hartford's expert, upon examining the economizer, concluded (and the City later agreed) that the defective welds created by Zurn "would have begun to accumulate at some time during day one [of boiler operation] until [the weld] was removed from service. . . ." Paper 154, at ¶ 9.

### B. *Procedural History*

Each Defendant insured the City's boiler unit at some time period between 1982 and 1999. On October 15, 1999, the City, through its insurance broker, Global Risk Associates, Inc., sent each Defendant a notice of a claim in connection with the faulty economizer. On May 24, 2000, the City filed this lawsuit, seeking reimbursement for: (1) costs incurred during 1995 to 1999 to repair 34 weld leaks in the lower section of the economizer; (2) costs incurred to hire Bremco to remove and replace all the welds in the lower section of the economizer; (3) consequential damages associated with the extended mandatory shutdown of the plant for repairs by Bremco, including costs to secure replacement power and lost opportunity sales of electric energy; (4) costs to re-fire the boiler after each repair job; (5) expected damages to

remove and replace all allegedly defective welds in the upper and middle portions of the economizer; and (5) prejudgment interest.[4]

## II. *Standard for Summary Judgment*

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to a judgment as a matter of law. *See Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.2000) (citing Fed.R.Civ.P. 56(c), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve the issues of fact, but to decide instead whether, after resolving all the ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Id.*

### III. *Analysis*

A. *Factory Mutual and the City's Cross-Motions for Summary Judgment*

### 1. *The Factory Mutual Policies*

Factory Mutual is the successor in interest to the rights and obligations under policies issued to the City by Protection Mutual Insurance Company, Arkwright–Boston Manufacturers Mutual Insurance Company, and Arkwright Mutual Insurance Company.

### a. *The Protection Mutual Policy*

The Protection Mutual Insurance Company issued an insurance policy to the City to cover certain risks of loss and damage

to the McNeil Plant, for the period July 1, 1982 to July 1, 1985.[5] Section IV of the policy, the only section at issue here,[6] contains the following provisions:

[T]his Policy ... covers all risks of direct physical loss or damage to the herein insured property only while such property is located on the described premises ....

\* \* \* \* \* \*

### EXCLUSIONS

\* \* \* \* \* \*

**This Section does not cover loss or damage:**

a. Caused by or resulting from interruption of business or indirect loss unless endorsed hereon; ....

\* \* \* \* \* \*

**This Section does not insure against:**

a. (1) Errors in design, faulty workmanship, use of faulty materials, in the development, processing or manufacture of the Insured's products, or error in machine or computer programming, or loss or damage attributable to manufacturing or processing operations which result in damage to stock or materials while such stock or materials are being processed, manufactured, tested or otherwise being worked upon;

(2) The cost of making good any faulty workmanship, material, construction or design; ....

Paper 129, Ex. 2.

### b. *The Arkwright Policies*

The Arkwright–Boston Manufacturers Mutual Insurance company issued an "all

---

4. The City also seeks punitive damages against Hartford in connection with the City's claim of bad faith.

5. The City disputes Factory Mutual's contention that the Protection Mutual Policy was cancelled in 1984. As discussed below, the question whether the policy was cancelled

during 1984 or expired as scheduled in 1985 is not material to the Court's ruling on the parties' motions.

6. *See* Paper 123, at 5 ("Only the coverage afforded by Section IV is at issue here.").

risk" policy to the Northeast Public Power Association ("NEPPA"), that included coverage for the City's McNeil Plant, effective January 20, 1985 through January 20, 1988. The Arkwright Mutual Insurance Company issued a separate insurance policy to NEPPA, also covering the McNeil Plant, effective January 20, 1988 through January 20, 1991.

Both Arkwright policies provide insurance "without compensation for loss resulting from interruption of business or manufacture ... against ALL RISKS of PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded." Paper 129, Ex.'s 3 & 4. Both Policies also contain the following provisions:

This Policy does not insure against:

1. indirect or remote loss or damage;
 . . .

3. faulty workmanship, material, construction or design from any cause, unless physical damage not otherwise excluded by this Policy results, in which event, this policy will cover only such resulting damage; ...

*Id.*

### 2. *Discussion*

#### a. *The Protection Mutual Policy's Exclusion For Faulty Workmanship*

The City attacks the applicability of the Protection Mutual faulty workmanship provision on three grounds. The City contends that under Vermont law, insurance contract exclusion provisions cannot be enforced unless the insurer demonstrates that the exclusion in question was approved by the Vermont Department of Banking, Insurance, Securities and Health Care Administration ("VDBISHCA"). The City also argues that the "faulty workmanship" clause is ambiguous as a matter of Vermont law, and must be construed in favor of coverage according to the rule

that "where a disputed term in an insurance policy is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured." *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd. ("AEGIS")*, 164 Vt. 218, 669 A.2d 1181, 1183 (1995). Finally, even if the exclusion is found unambiguous, the City contends that the terms of the exclusion do not encompass the type of losses experienced in this case.

The Court disagrees with City's interpretation of the law and the faulty workmanship exclusion.

#### i. *Failure to Demonstrate Regulatory Approval Is Not Fatal to Factory Mutual's Faulty Workmanship Exclusions*

■ Factory Mutual has not presented proof that the faulty workmanship exclusions in its three policies received the approval of the VDBISHCA. Citing Vt. Stat. Ann. tit. 8, § 3541(a)—a law requiring insurance companies to obtain VDBISHCA's approval of policies before they may be issued—the City asks the Court to void Factory Mutual's faulty workmanship exclusions.

Addressing this issue previously, the Second Circuit was "not convinced that the Vermont Supreme Court would declare a particular exclusion invalid ... based on the insurer's failure to file policy forms with VDBI[SHCA]." *Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 78 n. 7 (2d Cir.1999). The City cites no statute or regulation suggesting that proof of filing is required before a court may enforce a policy's terms. Indeed, Vermont law already deters insurance companies from failing to comply with the filing requirement. *See* Vt. Stat. Ann. tit. 8, § 4209 (providing for *administrative*, not civil penalties, including fines and possible license revocation, for willfully issuing unap-

proved insurance policy); *Larocque v. State Farm Ins. Co.*, 163 Vt. 617, 660 A.2d 286, 288 (1995) (entry order) ("Although the Vermont Insurance Trade Practices Act, 8 V.S.A. §§ 4721–26, provides administrative sanctions for unfair and deceptive acts within the insurance industry . . . the Act does not create a private right of action.").

■ However, courts retain the authority to declare contract provisions void if they are found "injurious to the interests of the public or [in] contrave[ntion] [of] some established interest of society." *State v. Barnett*, 110 Vt. 221, 3 A.2d 521, 526 (1939). The City relies on *Vermont American Corporation v. American Employers Insurance Company*, No. 330–6–95 WnCv (Vt.Super. Ct., Washington Cty. Oct. 31, 1997), in which the court voided a pollution exclusion where the insurer failed to provide proof of filing because "[i]t would be unreasonable to allow insurers to benefit from a failure to comply with Vermont insurance regulations or a failure to prove that the exclusions were properly filed." *Id.*, slip op. at 4.

The exclusions at issue in *Vermont American*, however, were *pollution* exclusions, and pollution exclusions—the court noted—had been repeatedly rejected on public policy grounds by the VDBISHCA. *See id.* at 2–3. By contrast, given the lack of situations in which courts have disapproved of faulty workmanship exclusions, the Court finds no concomitant requirement for the insurer to demonstrate regulatory approval.

ii. *The Protection Mutual Faulty Workmanship Exclusion is Unambiguous*

■ Although the City is correct that under Vermont law an ambiguous provi-

sion in a written instrument is construed against the party responsible for drafting it, *see N. Sec. Ins. Co. v. Perron*, 777 A.2d 151, 154 (Vt.2001), "[t]he insurer . . . should not be deprived of unambiguous provisions put into a policy for its benefit," *see N. Sec. Ins. Co. v. Hatch*, 165 Vt. 383, 683 A.2d 392, 394 (1996) (citing *Peerless Ins. Co. v. Wells* 154 Vt. 491, 580 A.2d 485, 487 (1990)).

The City contends that ambiguity exists because section (a)(1) of the exclusion clause expressly refers not to the City's boiler or generator unit, but rather to the "manufacture of the Insured's products." [7] Since Zurn, and not the City, *manufactured* or *produced* the boiler, the City argues the boiler is not the City's "product" within the meaning of this exclusion clause. In other words, the exclusion would apply, but only if the City was a manufacturer and the boiler was the City's "product."

"Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Vt. Elec. Power Co. ("VELCO") v. Hartford Steam Boiler Inspection & Ins. Co.*, 72 F.Supp.2d 441, 444–445 (D.Vt.1999) (citations and internal quotations omitted); *see Towns v. Vt. Mut. Ins. Co.*, 169 Vt. 545, 726 A.2d 65, 67 (1999) (entry order); *AEGIS*, 669 A.2d at 1183.

There is no ambiguity here. The "Insured" is the City, not Zurn. The "products" in question are those found at the McNeil Plant, including its boiler unit. The exclusion, therefore, bars recovery for costs incurred to repair faulty workmanship in the manufacture of the City's McNeil Plant.

---

7. Moreover, according to the City, clause (a)(2) must be read in conjunction with clause (a)(1), so that both clauses refer to "the Insured's products."

Alternatively, relying on *City of Barre v. New Hampshire Insurance Company*, 136 Vt. 484, 396 A.2d 121 (1978), the City argues that the words "faulty workmanship" are ambiguous as a matter of Vermont law. *City of Barre* was a builder's risk insurance case in which the loss occurred during construction of a recreation building when several recently-erected wooden arches were blown down by a gusting wind. *See City of Barre*, 396 A.2d at 121. The trial court found the collapse was caused by the builder's negligence, namely, failing to secure and support the structures in accordance with recommended architectural and construction standards. *See id.*[8] The policy expressly excluded coverage as to "any loss caused directly or indirectly by faulty materials or faulty workmanship or error in design or latent defect." *Id.* at 122. In reversing the trial court's judgment for the insurer, the Vermont Supreme Court concluded that

> [f]airly read, the policy in question excludes coverage for damage resulting from defective materials incorporated into the structure itself, or from weaknesses in the product caused by faults in the construction process, but it does not exclude coverage for damage caused, at least in part, by negligent practices of the contractor during the construction process. *It is the quality of the product which is excluded from coverage, and not damage to the product caused by negligence during the construction process.*

*Id.* at 122–23 (emphasis added). The City reads the Court's holding to implicitly recognize that the term "faulty workmanship" supports at least two different, reasonable interpretations: (1) the inherently flawed quality of a finished product, or (2) a flawed process or practice in producing the product.

The Court disagrees with the City's interpretation. The Vermont Supreme Court not only failed to expressly recognize any ambiguity, but also the last sentence of its holding (emphasized above) contains the Court's unequivocal interpretation of the term "faulty workmanship": it encompasses "quality of product" claims (whether due to defective materials or faults during the construction process) and not claims for accidental damage to the product caused by the builder's negligence during construction (*e.g.*, failing to secure large wooden arches to withstand wind). Other courts have interpreted *City of Barre* similarly, and this Court finds no case that construes it otherwise. *See, e.g., Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.*, 219 F.3d 501, 506 (5th Cir. 2000); *United States Indus., Inc. v. Aetna Cas. & Sur. Co.*, 690 F.2d 459, 462–63 (5th Cir.1982); *Tzung v. State Farm Fire & Cas. Co.*, 873 F.2d 1338, 1341 (9th Cir. 1989). Moreover, a large majority of courts which examined the issue held that "faulty workmanship" is unambiguous when used in an exclusionary clause of an insurance contract. *See, e.g., L.F. Driscoll Co. v. Am. Prot. Ins. Co.*, 930 F.Supp. 184, 187–88 (E.D.Pa.1996), *aff'd without op.* 114 F.3d 1172 (3d Cir.1997); *Bangert Bros. Constr. Co. v. Americas Ins. Co.*, 888 F.Supp. 1069, 1073 (D.Colo.), *aff'd without op.* 66 F.3d 338, 1995 WL 539479 (10th Cir.1995); *Tzung*, 873 F.2d at 1341; *Kroll Constr. Co. v. Great Am. Ins. Co.*, 594 F.Supp. 304, 307 (N.D.Ga.1984); *Schultz v. Erie Ins. Group*, 754 N.E.2d 971, 976–77

---

**8.** The Vermont Supreme Court elsewhere clarified the nature of the cause of the loss as follows: "What happened was the result of misjudgment of the amount of temporary capable support needed, on that particular day, to support the arches when the wind increased." 396 A.2d at 122.

(Ind.Ct.App.2001) (collecting two additional state court cases); *but see Allstate Ins. Co. v. Smith,* 929 F.2d 447, 450 (9th Cir. 1991). Accordingly, the Court finds the faulty workmanship provision unambiguous.

iii. *The Protection Mutual Faulty Workmanship Exclusion Bars Coverage*

■ The City argues that if the "faulty workmanship" exclusion applies, it should be given a narrow construction—to cover defects in metallurgy or other inherent qualities of the sections of metal tubing which were welded together to form the economizer tubes—but not the welds themselves. Plaintiff cites no Vermont cases for such an interpretation and fails to convincingly explain how or why a court may distinguish between some kinds of faulty workmanship (*e.g.,* that which caused defects in tube pieces or other materials) and other faulty workmanship (*e.g.,* welding) which caused defects at the junctions between the tube pieces. *Cf. City of Barre,* 396 A.2d at 122.

The welds are an example of poor or faulty workmanship. Protection Mutual Policy's exclusion prevents the City from recovering its costs incurred to "make good" (through either repair or replacement) the faulty welds.[9]

c. *The Arkwright Policies' Exclusions for Faulty Workmanship*

■ The City emphasizes that both Arkwright policies are called "all risk" policies, but as former Second Circuit Judge Friendly once observed, that label is "a misnomer" to the extent such policies typically contain several exclusions. *Aetna Cas. & Sur. Co. v. Yates,* 344 F.2d 939, 940 (5th Cir.1965) (Friendly, J., sitting by designation); *see Standard Structural Steel Co. v. Bethlehem Steel Corp.,* 597 F.Supp. 164, 191 (D.Conn.1984) ("All risk policies are not 'all loss' policies; . . . they contain express written exclusions and implied exceptions which have been developed and applied by the courts over the years.").

Given the analysis of the Protection Mutual faulty workmanship exclusion, *supra,* the City can escape the Arkwright policies' faulty workmanship exclusion only if the term "resulting damage" appearing in the exclusion can be reasonably construed to include the costs of repairing defective welds. This Court's decision in *VELCO, supra,* provides clear instruction here.

The plaintiff in *VELCO* purchased three transformers without knowing they suffered from a defective condition. More than a decade after the transformers were installed and began operating, they began to short-circuit due to overheating. Later investigation revealed the overheating problems were "progressively caused by continuous damage, which were allegedly the consequence of defective design." 72 F.Supp.2d at 443. The policy at issue contained the following exclusion:

This policy does not insure against loss caused by any of the following. However, any ensuing loss not excluded or excepted in this policy is covered.

\* \* \* \* \* \*

9. In its pleadings, the City does not contest the validity or scope of the Protection Mutual Policy's exclusion for damages "[c]aused by or resulting from interruption of business or indirect loss." The Court agrees with Factory Mutual that this provision precludes claims for lost opportunity sales, replacement power costs, or costs associated with re-firing the boiler. *Cf. Riefflin v. Hartford Steam Boiler Inspection & Ins. Co.,* 164 Mont. 287, 521 P.2d 675, 677–78 (1974); *Twin City Hide v. Transamerica Ins. Co.,* 358 N.W.2d 90, 92 (Minn.Ct.App.1984).

Faulty, inadequate, or defective: ... design, specifications, workmanship, repair, construction, ... of part of all of any property, on or off the described premises.

*Id.* at 445. Plaintiffs sought to avoid the exclusion on grounds that the damage to the transformers was an "ensuing loss," the consequence of the defective design. *See id.* This Court rejected that argument:

The loss itself ... was not the design defect, but the damage to the transformers; the defective design was the cause. An ensuing loss would be one which occurred subsequent to the overheating of the transformers, for example, fire destruction of the building which housed the transformers.

*Id. See also Alton Ochsner Med. Found.,* 219 F.3d at 507 ("resulting damage" does not cover costs and expenses associated with the repair of the faulty property; "For example, if shoddy plumbing work caused pipes to break and a building to flood, damaging the carpet, the policy would cover the cost of replacing the carpet but not the cost of repairing or replacing the shoddy plumbing job.").

In this case, "resulting damage" is the same as "ensuing loss" and does not encompass the costs to repair or replace the faulty welds. Coverage is thereby precluded.[10]

### B. *Allianz and the City's Cross–Motions For Summary Judgment*

#### 1. *The Allianz Policy*

Defendant Allianz issued an "all risks builder's risk" insurance policy to the City covering "against all physical loss and/or damage from any cause whatsoever," for the period March 23, 1982 to January 23, 1984. Paper 129, Ex. 1. Coverage under the policy is afforded to:

Any and all materials, equipment, machinery, tools and supplies of any nature whatsoever including buildings and all temporary structures to be used in or incidental to the fabrication and/or erection and/or completion of the property and/or project ....

*Id.* Effective August 13, 1982, by letter and with subsequent assent by Allianz, the City terminated the Allianz policy. *See* Paper 128, ¶ 2; Paper 94, ¶¶ 2–4.

#### 2. *Discussion*

Neither party disputes the basic rule that "an insurer's obligation to pay is contingent on a covered loss occurring during the policy period," 7 Lee R. Russ & Thomas F. Segella, *Couch on Insurance* § 102:2 (3d ed.1997), but disagree as to what constitutes a "loss" under the policy, and when the losses occurred. Allianz primarily argues that because the Allianz policy was terminated in August 1982, well prior to any manifest losses experienced by the City, there is no coverage. Further, Allianz maintains that the faulty shop welds—although actually performed during the period of time the policy was in effect, and although a probable cause of damage to the welds—are not in their initial condition a "physical loss or damage."

The City counters that the shop welds themselves constitute "physical loss or damage": "As long as the economizer's shop welds lack full penetration, their vio-

---

**10.** In its pleadings, the City does not contest the validity or scope of the Arkwright Policies' exclusions for "indirect loss" or "loss resulting from interruption of business or manufacture." The Court agrees with Factory Mutual that these provisions preclude the City's claims for lost opportunity sales, replacement power costs, or costs associated with re-firing the boiler. *See* note 9, *supra.*

lation of the ASME Code amounts to 'damage' within the scope of coverage afforded by the Allianz Policy. . . . Thus, all efforts by the City to bring the welds up to code, and the financial consequences thereof, amount to a 'loss' whether or not a particular weld has leaked." Paper 124, at 14. The City also contends that since there is no exception in the policy for initial defects due to workmanship, the Allianz policy provides for coverage against losses or damage resulting from "any cause whatsoever." Finally, citing *American Protection Insurance Company v. McMahan,* 151 Vt. 520, 562 A.2d 462 (1989), the City argues that the Vermont Supreme Court would adopt the "exposure theory" instead of the "manifestation theory" in this case and find that "the exposure in this case was the creation of the shop welds . . . ." Paper 124, at 12.

3. *Initial Defects in the Shop Welds Due to Faulty Workmanship Do Not Constitute a "Loss" Under the Allianz Policy*

■ Vermont law provides basic guidelines for construing insurance policies. "An insurance policy must be construed according to its terms and the evident intent of the parties as expressed in the policy language . . . [and][d]isputed terms should be read according to their plain, ordinary and popular meaning." *N. Sec. Ins. Co. v. Perron,* 777 A.2d 151, 154 (Vt. 2001) (citations and internal quotations omitted). "However, 'where a disputed term in an insurance policy is susceptible to two or more reasonable interpretations, the ambiguity must be resolved in favor of the insured.' " *Id.* (quoting *City of Burlington v. Associated Elec. & Gas Ins. Servs. ("AEGIS"), Ltd.,* 164 Vt. 218, 669 A.2d 1181, 1183 (1995)). The fact that a policy term is not expressly defined in the policy does not make it ambiguous, *see Towns v. Vermont Mut. Ins. Co.,* 169 Vt.

545, 726 A.2d 65, 67 (1999) (entry order), and extended analysis of a policy term does not imply ambiguity, *see, e.g., id.; AEGIS, supra.*

■ The Allianz policy does not define the terms "loss," "damage," or "cause." Nor do Vermont cases or statutes shed light on whether an initial workmanship defect in a product constitutes a recoverable "loss" or "damage" under an "all risks builder's risk" policy.

However, this Court's opinion in *VELCO, supra,* is again instructive. The electrical transformers in that case were found to be initially defective. *See VELCO,* 72 F.Supp.2d at 443. Over time, it was later discovered, these initial design defects caused physical damage to the transformers. *See id.* The plaintiff asserted the initial "loss" was the design defect itself and the damage to the transformer caused by the defect was therefore the "ensuing loss." *See id.* at 445. This Court squarely rejected that argument, observing that: "The loss itself . . . was not the design defect, but the damage to the transformers; the defective design was the cause." *Id.*

Other courts have found that an initial fault or defect in an insured property does not constitute "physical loss or damage" under "all risks builder's risk" policies. *See, e.g., Trinity Indus., Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267 (5th Cir.1990); *Bethesda Place Ltd. P'ship v. Reliance Ins. Co.,* Civ. A. No. HAR 91–1719, 1992 WL 97342 (D.Md.1992); *Wolstein v. Yorkshire Ins. Co., Ltd.,* 97 Wash.App. 201, 985 P.2d 400 (1999). For example, in *Trinity,* a builder's risk policy was issued to a shipbuilder, insuring against all risks of "physical loss or damage." *See Trinity,* 916 F.2d at 269. In denying the shipbuilder's claim to recover the cost of an arbitration award paid to the ship owner for a defec-

tive "twist" in the hull of the ship that occurred during construction, the Fifth Circuit opined as follows:

> We are mindful of the many cases that have found defective workmanship to be a risk covered by all risk policies. These cases, however, have dealt with an accident caused by defective workmanship, not with the cost of repairing or replacing defective workmanship. In our case, the faulty workmanship, the twist, has not led to any such accident. In fact, in all of the cases cited by plaintiff, and that we have found on this issue, faulty workmanship or design *led to a discrete event* that a reasonable person would call an accident. And, in each case, the court faced the question of whether an all risks policy covered the damage *from* the resulting accident. . . .

> That it should cover *accidents* caused by the negligence of the insured does not justify reading such a policy to cover the costs of replacing or repairing crooked window frames or crooked door frames, even though the crookedness of

the frame was undoubtedly the result of the insured's negligence. . . .

> Thus, when an insured has made claims for the collapse of the insured subject matter because of faulty design, district courts have awarded as damages the cost to rebuild the structure *in its defective state*. They have not awarded as damages the cost to redesign or rebuild the structure so as to eliminate the defect. This reflects an interpretation of the all risks policy to cover accidents resulting from defective design or workmanship, but not the cost of repairing the defect itself.

*Id.* at 270–71 (emphasis added, footnote citations omitted). *See also Bethesda Place*, 1992 WL 97342, at *1–3 ("All–Risk Builder's Risk Form" policy) ("case law does not support the argument that a design defect in and of itself constitutes physical injury or damage to property from an external cause").

Accordingly, the initial welds in this case do not in themselves constitute a "loss" or "damage" within the terms of the Allianz policy.[11] The shop welds were completed on August 2, 1982. The policy was termi-

---

11. This construction of the scope of coverage of the Allianz policy does not supercede and render superfluous the policy's "faulty workmanship" exclusion. As explained in *VELCO* and *Trinity*, the damage caused to a product as a direct result of initial defects in the product are encompassed by the terms "loss" and "damage." Like the "faulty workmanship" exclusions in the Protection Mutual and Arkwright policies, the Allianz "faulty workmanship" exclusion in the Allianz policy is meant to preclude coverage for costs to repair damage to the product directly resulting from the defective welds. Nor does the phrase "any cause whatsoever" save the City; the defective welds may be a "cause" of physical damage to the welds and the economizers, but the welds are not by themselves a "loss" or "damage."

The City also contends that Allianz's failure to timely reply to the City's October 15, 1999 demand for coverage precludes Allianz from

asserting a defense founded on the policy's "faulty workmanship" exclusion. This Court's conclusion does not depend on any exclusion provision, however, but simply finds that coverage does not exist under the policy. Indeed, the Court does not need to reach the issue whether Allianz's conduct waived the exclusion, since "[a]ny defenses which relate to the existence or scope of coverage are not waivable[;] . . . courts will not create coverage where none exists." Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 2.06[a] (9th ed.1997). For the same reason, without considering the scope of the Allianz Policy's exclusion for "consequential loss of any nature howsoever caused," Paper 129, Ex. 1, the Court finds no coverage for the City's claims for consequential damages. *Cf. Witcher Constr. Co. v. Saint Paul Fire & Marine Ins. Co.*, 550 N.W.2d 1, 5 (Minn.Ct.App.1996).

nated as of August 13, 1982. Since the completed economizer tubes were not operational until March 1984, no reasonable jury could find that appreciable physical damage constituting a "physical loss or damage" occurred to the completed shop welds between August 2, 1982, and August 13, 1982.[12]

### C. HIC and the City's Cross–Motions for Summary Judgment

#### 1. The HIC Policies

HIC, with a principal place of business in Manchester, New Hampshire, issued two policies to the Northeast Public Power Association ("NEPPA") at its place of business in Wellesley, Massachusetts. As explained below, both policies covered the property located at the City's McNeil Plant.

#### a. HIC's Boiler Policy

HIC issued a so-called "Boiler Policy" to NEPPA for the period of January 20, 1984 through January 20, 1987. It covers a number of Massachusetts-based public power entities and their facilities, but also contained endorsements identifying the Burlington Electric Department as one of the insureds and the McNeil Plant as one of the covered locations. Under the heading "Coverage A, Loss To Property of Insured," HIC agreed

[t]o PAY for loss to the property of the Insured directly damaged by ... Accident (or, if [HIC] so elects, to repair or replace such damaged property), excluding ...

(f) loss from delay or interruption of business or manufacturing or process ... and

(h) loss from any other indirect result of an Accident.

Paper 120, Ex. A ("Insuring Agreement"). The Boiler Policy also provided, under the heading "Coverage B, Repair or Replacement," that HIC would

PAY to the extent of any indemnity remaining after payment of all loss as may be required under Coverage A, that amount actually expended by the Insured to repair or replace property of the Insured directly damaged by such Accident, which is in excess of the actual cash value of said property at the time of the Accident.

*Id.* The Boiler Policy defines "Accident" as "a sudden and accidental breakdown of the Object or part thereof, which manifests itself at the time of its occurrence by physical damage to the Object that necessitates repair or replacement of the Object or part thereof...." *Id.* ("Conditions," ¶ 1). The Policy also explains that "Accident" does not encompass "depletion, deterioration, corrosion, or erosion of material ... wear and tear ... leakage at any valve, fitting, shaft seal, gland packing, joint or connection ... the breakdown of any vacuum tube, gas tube or brush." *Id.* Effective January 20, 1985, at the request of NEPPA, HIC cancelled the Boiler Policy.

#### b. HIC's All Risk Policy

HIC issued a so-called "All Risk Policy" to NEPPA for the period January 20, 1984 through January 20, 1987. The policy covers the property and operations of a number of Massachusetts-based public power entities, but also included properties owned by the Burlington Electric Department, including the McNeil Plant. The All Risk Policy insured against "ALL RISKS OF DIRECT PHYSICAL LOSS TO THE

---

**12.** The City evidently concedes this point. *See* Pl.'s Statement of Undisputed Facts in Support of Its Mot. for Summ. J. Against

Hartford (Paper 154), at ¶ 9 (quoting Transcript of Deposition of Hartford's expert Ronald Munson, attached thereto as Ex. 15).

PROPERTY COVERED HEREIN." *Id.,* Ex. B, at 3. However, the policy excluded coverage

against loss or damage caused by or resulting from: . . .

cost of making good faulty or defective workmanship or material, but this exclusion shall not apply to physical damage resulting from such faulty or defective workmanship material; . . . rupture, bursting, cracking, burning or bulging of steam boilers, including equipment attached to and forming part thereof, steam turbines, steam engines, steam pipes interconnecting any of the foregoing, hot water boilers or other equipment for heating water, pressure vessels, including equipment attached to and forming a part thereof, or gas turbines; . . .

delay; loss of market; . . . deterioration; latent defect; wear; tear . . .

interruption of business or other consequential loss extending beyond direct physical loss or damage to the property insured hereunder . . . .

*Id.* at 4–5. The All Risks Policy also contains a "Notice of Loss" provision, which reads as follows:

In the event of loss or damage under this policy the Insured shall give notice of loss or damage to [HIC] as soon thereafter as practicable and shall also file with [HIC] within ninety (90) days from the date of loss a detailed sworn proof of loss. Failure by the Insured to report the said loss or damage and to file such sworn proof of loss as hereinbefore provided shall invalidate any claim under this policy for such loss.

*Id.* at 8. Effective January 20, 1985, at the request of NEPPA, HIC cancelled the All Risks Policy.

### 2. *Choice of Law*

■ Unlike the other Defendants in this case, HIC contends that its dispute should be resolved under Massachusetts law rather than Vermont law. HIC points out that its policies were issued to NEPPA at NEPPA's Wellesley, Massachusetts place of business, implying that the place of contracting should control on the choice of law question. This Court has observed, however, that where parties from multiple jurisdictions are involved in an insurance coverage dispute pertaining to one site or property location, "the location of the site or insured risk is the factor which carries the most weight." *Maska, U.S., Inc. v. Kansa Gen. Ins. Co.,* No. 1:93CV309, slip op. at 2 (D.Vt. Dec. 2, 1996) *rev'd on other grounds* 198 F.3d 74 (2d Cir.1999); *see also E.B. & A.C. Whiting Co. v. Hartford Fire Ins. Co.,* 838 F.Supp. 863, 865–66 (D.Vt.1993) (explaining that in single site cases involving multiple jurisdictions, the law of the site should control rather than the place of contracting).

■ In this case, the site of the insured property is Burlington, Vermont. Moreover, although not a signatory to the contract with HIC, the City of Burlington Electric Department, a Vermont party, was expressly listed as an insured. HIC could have anticipated that Vermont law would govern claims made in connection with the City's McNeil Plant. Thus, Vermont law controls the resolution of the City's claims under HIC's two policies.

### 3. *No Coverage Exists Under HIC's Boiler Policy*

■ HIC cannot be held liable under its Boiler Policy because no "accident" occurred when the Policy was in effect. There was no "breakdown" of the boiler welds which "manifest[ed] itself at the time of its occurrence by physical damage to [the welds] that necessitate[d] [their]

repair or replacement" at least until 1987, the date of the first weld leak.[13]

### 4. HIC's All Risks Policy Does Not Provide Coverage

Like Allianz, HIC contends that because leaks were not experienced in the economizer welds until 1987, the City had no covered loss or damage within the policy period. Unlike Allianz, however, HIC's policy covered against physical loss for a period of time when the boiler was actually installed and operational—January 20, 1984 to January 20, 1985.

Assuming, therefore, that the losses or damages of the City fall within the time period and scope of coverage afforded by the All Risks Policy, HIC asserts a number of defenses founded on claim procedure and coverage exclusion clauses of the Policy. For example, HIC contends the City's delay in notifying HIC of any claim until October 1999 forfeited all claims under the Policy's "notice of loss" provision. Additionally, HIC contends that because the City seeks to recover the expenses incurred to repair faulty workmanship or construction, the claims fall within the Policy's unambiguous exclusion for such costs.

The City counters that HIC's failure to timely and appropriately respond to the City's October 15, 1999 claim for coverage waived all of HIC's policy defenses. In particular, the City maintains HIC was obligated to deny or admit coverage, by formal written letter, within a reasonable period of time following the receipt of the City's notice of claim letter.

"Waiver has sometimes been viewed as an issue of fact for the jury, particularly where acts and conduct are relied upon as the basis for a finding of waiver. Where the evidence of waiver is undisputed, however, the issue is one for the court. In [particular], where the evidence supporting waiver is derived from the insurance policy, [and] correspondence between the parties ... the issue is ripe for summary judgment" *Haley v. Continental Cas. Co.,* 749 F.Supp. 560, 566 (D.Vt.1990) (internal citations omitted), *aff'd without op.* 927 F.2d 593 (2d Cir.1991); *see also Cummings v. Connecticut Gen. Life Ins. Co.,* 102 Vt. 351, 148 A. 484, 487 (1930) ("Waiv-

---

**13.** In finding that no "accident" occurred during the policy period, the Court does not adopt or endorse any particular insurance coverage "trigger theory," but instead follows what the HIC Boiler Policy itself defines as the trigger. *See* Chandra Lantz, Note, *Triggering Coverage of Progressive Property Loss: Preserving the Distinctions Between First- and Third-Party Insurance Policies,* 35 Wm. & Mary L.Rev. 1801, 1809 (1994) ("[B]ecause the policy defines the indemnity relationship between the insured and the insurer, it should and must be the central focus of a court's analysis in any coverage dispute."); *City of Burlington v. A.J. Gallagher & Co.,* 944 F.Supp. 333, 337 ("In Vermont insurance policies are interpreted according to their terms and the evident intent of the parties as expressed in the policy language.") (citing *City of Burlington v. Nat'l Fire Ins. Co.,* 163 Vt. 124, 655 A.2d 719, 721 (1994)). It is enough to resolve the coverage question that no *breakdown* in the welds manifesting itself at the time of its occurrence by physical damage requiring repairs occurred until 1987, *after* the policy period. *Compare* Paper 95, Ex. S, at 116–17, lines 23–25 & 1–11 (explaining that welds that lack full root penetration may function for years without leaks), *with Riefflin v. Hartford Steam Boiler Inspection & Ins. Co.,* 164 Mont. 287, 521 P.2d 675, 678 (1974) (the cost to remove buildup of scale within a boiler that was found to cause cracking in the boiler was not an insured cost under the policy's definition of "accident" because scale build-up in itself did not prevent the boiler from operating safely and was not a "breakdown of the object" which was manifested itself at the time of its occurrence "by physical damage to the object that necessitates repair or replacement of the object"). *See also Cyclops Corp. v. Home Ins. Co.,* 352 F.Supp. 931, 933 (W.D.Pa.1973) (noting the important distinction between "breakdown" and "damage" in boiler policy definition of "accident").

er is usually a question of fact ... [b]ut, where all the facts and circumstances are undisputed, the question is for the court.").

In this case, the parties hotly dispute a factual question that appears central to the resolution of the issue of waiver: whether HIC received the City's claim letter in October of 1999 (as the City contends), or, alternatively, received only some form of claim notice in April of 2000 (as HIC contends). This factual question is not controlling, however, and there is sufficient, unquestioned evidence to make the issue ripe for summary judgment. Assuming *arguendo* that HIC received the City's October 1999 claim notice without delay, HIC did not waive the faulty workmanship exclusion defense.[14] Further, the faulty workmanship exclusion precludes coverage under the HIC policies.

### a. HIC Did Not Waive Its Faulty Workmanship Exclusion Defense

According to well-established Vermont law,

> [a] waiver is the voluntary relinquishment of a known right. To establish it, there must be shown an act or omission on the part of the one charged with the waiver fairly evidencing an intention permanently to surrender the right in question. It may be express or implied. But, if it is of the latter class, caution must be exercised in proof and application. The facts and circumstances relied

upon must be unequivocal in character. Silence, alone, is never a waiver. It is only where there is an obligation to speak that it has that result.

*Dunbar v. Farnum*, 109 Vt. 313, 196 A. 237, 241 (1938) (internal citations omitted); *see also Kanaan v. Kanaan*, 163 Vt. 402, 659 A.2d 128, 136 (1995) (waiver is not created by mere oversight and cannot be inferred from silence; instead, waiver requires proof of a voluntary and intentional relinquishment of a known right); *Farm Bureau Mut. Auto. Ins. Co. v. Houle*, 118 Vt. 154, 102 A.2d 326, 330 (1954) ("A waiver is the intentional relinquishment of a known right... [and] involves both knowledge and intent."); *Reynolds v. John Hancock Life Ins. Co.*, 117 Vt. 541, 97 A.2d 121, 126 (1953) ("Silence, alone, is never a waiver.") (citing *Dunbar*).

"In the typical insurance case, the insurer must know of its right to assert either contractual or statutory defenses to the insured's right to recover under a policy." *Haley*, 749 F.Supp. at 566. "A waiver involves the act or conduct of one of the parties to the contract, only .... [and] does not necessarily imply that one has been misled to his prejudice or into an altered position." *Houle*, 102 A.2d at 330 (citations omitted); *see also Lynda Lee Fashions, Inc. v. Sharp Offset Printing, Inc.*, 134 Vt. 167, 352 A.2d 676 (1976). "The burden of establishing a waiver is

---

**14.** The City's claim of estoppel is also unconvincing. Under Vermont law, "[i]t is an essential element in estoppel that the party claiming it was induced to act or refrain from acting by it and thus relying and induced did take some action." *Farm Bureau Mut. Auto. Ins. Co. v. Houle*, 118 Vt. 154, 102 A.2d 326, 330 (1954). Prejudice is an issue of fact, but the City fails to make even a preliminary showing or allegation that it was induced by HIC's conduct into acting or failing to act or that such act or omission resulted in a cognizable harm. It is insufficient to allege that

delay in receiving HIC's response resulted in "prejudice," without presenting some facts that the City was induced or harmed due to the delay. *See Vasilakis v. Safeway Ins. Co.*, 46 Ill.App.3d 369, 5 Ill.Dec. 1, 361 N.E.2d 1, 3–4 (1977) ("[A] long delay in asserting a policy defense or disclaimer is *normally not enough* to constitute an estoppel or waiver ... delay is an important factor to be considered *where there is evidence of prejudice*.") (emphasis added); *Gallagher*, 944 F.Supp. at 338 (citing *Vasilakis*).

upon the party asserting it." *Liberty Mut. Ins. Co. v. Cleveland,* 127 Vt. 99, 241 A.2d 60, 63 (1968).

Accepting the City's version of the facts of this case, HIC waited several months—from October, 1999 to April, 2000—before it responded to the City's notice of claim letter. The question is whether HIC's delay in responding constitutes an implied waiver of its policy defenses.

### i. *Vermont Case Law*

No Vermont cases offer much, if any, direct guidance on this question. The City cites *Cummings v. Connecticut General Life Insurance Co.,* 102 Vt. 351, 148 A. 484 (1930), in which the Vermont Supreme Court applied and explained the so-called "mend the hold" doctrine, as follows:

> The ["mend the hold"] rule works no hardship on the insurer. Considerations of public policy require that he shall deal with his individual customer with entire frankness. He may refuse to pay and say nothing as to the basis of his refusal. In that case, all defenses to an action on the policy are available to him. He may refuse to pay on a particular ground reserving the right to defend on other grounds, with the same result. But, when he deliberately puts his refusal to pay on a specified ground, and says no more, he should not be allowed to "mend his hold" by asserting other defenses after the insured has taken him at his word and is attempting to enforce his liability.

148 A.2d at 487.

The "mend the hold" doctrine does not apply in this case since HIC simply was

silent; there is no allegation that HIC misled the City by denying coverage on one ground while defending itself in this lawsuit on different grounds. *Cf. Armstrong v. Hanover Ins. Co.,* 130 Vt. 182, 289 A.2d 669, 673 (1972) ("It is significant that . . . the factual situation[ ] that brought the *Cummings* rule of law into operation was the assertation [sic] of reasons for denial of coverage other than those first asserted prior to litigation."). Thus, *Cummings* does not help on the question whether an insurer is under an affirmative obligation or duty to speak when it receives a notice of claim from its insured.

The City also cites this Court's decision in *VELCO, supra,* in which this Court stated that "[w]hen an insurer is or should have been aware of defenses and fails to disclose them prior to litigation, they are waived as a matter of Vermont law." *VELCO,* 72 F.Supp.2d at 446 (citing *Village of Morrisville Water & Light Dep't v. United States Fid. & Guar. Co. ("USF & G"),* 775 F.Supp. 718, 724 (D.Vt.1991)). Unfortunately for the City, that portion of Judge Sessions' opinion was vacated in a subsequent order. *See VELCO v. Hartford Steam Boiler Inspection & Ins. Co.,* No. 2:98–CV–256 (D.Vt. Jan. 28, 2000) (endorsing Defendant Hartford's Motion to Vacate (Paper 67) the Court's Opinion and Order dated Oct. 29, 1999 (Paper 63) as to VELCO's Motion for Partial Summary Judgment on Liability (Paper 42) and Hartford's Motion for Summary Judgment (Paper 33)).[15]

Finally, the HIC Policy created no impression that HIC's silence in the face of

---

**15.** Furthermore, even if that portion of *VELCO* was current, it would not support the City's position. In *VELCO,* the insurer—much like the insurer in *Cummings*—asserted particular policy defenses in correspondence to plaintiff without reserving its right to assert

additional defenses. *See VELCO,* 72 F.Supp.2d at 446–47. Citing *Cummings,* Judge Sessions ruled that the insurer waived all defenses other than those specifically raised in correspondence with the plaintiff. *See id.*

notice of claim letters would result in coverage. *Cf. Haley,* 749 F.Supp. at 568. Thus, HIC was under no contractual obligation or duty to seasonably deny or affirm coverage.

### ii. *Implied Good Faith Duties*

■ While the Court finds no *express* contractual duty imposed on HIC, under Vermont law "the parties to an insurance contract owe each other mutual duties of good faith and stand in the position of fiduciaries in relation to each other." *Phillips v. Aetna Life Ins. Co.,* 473 F.Supp. 984, 989 (D.Vt.1979); *see also Carmichael v. Adirondack Bottled Gas Corp.,* 161 Vt. 200, 635 A.2d 1211, 1216 (1993) ("An underlying principle implied in every contract is that each party promises not to do anything to undermine or destroy the other's rights to receive the benefits to the agreement."); *Morton v. Allstate Ins. Co.,* 58 F.Supp.2d 325, 330 (D.Vt.1999) ("Under Vermont law, an 'implied covenant of good faith and fair dealing prevails in every contract.'") (quoting *Logan v. Bennington Coll. Corp.,* 72 F.3d 1017, 1025 (2d Cir. 1995)).

Consistent with the implied duty of good faith, a duty to disclose certain information to the opposing party to a contract may arise "from the relations of the parties, such as that of trust or confidence, or superior knowledge or means of knowledge." *White v. Pepin,* 151 Vt. 413, 561 A.2d 94, 96 (1989) (citing *Cheever v. Albro,* 138 Vt. 566, 421 A.2d 1287, 1290 (1980)); *see also Commercial Ins. Co. of N.J. v. Papandrea,* 121 Vt. 386, 159 A.2d 333, 336 (1960) (as between insurer and insured, "[f]ull candor and complete honesty are required"). Ultimately, the good faith duty between contracting parties "'varies ... with the context.'" *Dicks v. Jensen,* 768 A.2d 1279, 1286 (Vt.2001) (quoting *Carmichael,* 635 A.2d at 1216).

■ Under Vermont law, after the insured's proofs of loss are accepted by the insurer, there is an obligation on the insurer to point out any defects or deficiencies in the proofs of loss if it later relies upon them to deny the claim. *See Reynolds v. John Hancock Life Ins. Co.,* 117 Vt. 541, 97 A.2d 121, 126–27 (1953); *Tyrrell v. Prudential Ins. Co. of Am.,* 109 Vt. 6, 192 A. 184, 189 (1937).

■ A duty to disclose also exists whenever an insurer's failure to seasonably deny coverage may deprive an insured of her ability to take action and protect her rights. *See Cleveland,* 241 A.2d at 63. Particularly, in the context of duty to defend policies, where insureds often lack the authority to control their defense, courts regularly find that an insurer must reply seasonably to an insured's notice of claim letter so that the insured does not lose an opportunity to conduct her own investigation, settle the claim, file her own lawsuit, or otherwise protect her interests. *See, e.g., Beatty v. Employers' Liab. Assurance Corp.,* 106 Vt. 25, 168 A. 919, 924 (1933) ("The [insurer] had complete control and management of [the insured's] interest, and [the insured] was deprived of any advantage that he might have had if the defense had been conducted by counsel of his own choosing."); *Griggs v. Bertram,* 88 N.J. 347, 443 A.2d 163, 170 (1982); *St. Paul Fire & Marine Ins. Co. v. Children's Hosp. Nat'l Med. Ctr.,* 670 F.Supp. 393, 402 (D.D.C. 1987) ("[I]t is the duty to defend that gives rise to the duty to disclaim or reserve rights at the time the defense is accepted.").

In this case, HIC was under no implied duty to seasonably assert the faulty workmanship exclusion defense.

■ First, unlike the defenses raised by the insurers in both *Reynolds* and *Tyr-*

*rell*, HIC's faulty workmanship exclusion defense is unrelated to the sufficiency of the proof of loss statement submitted by the City.[16] While *Reynolds* and *Tyrrell* hold that an insurer that fails to seasonably object to a proof of loss statement submitted in good faith waives its right to complain about any defects in the *statement* during subsequent litigation, those cases do not hold that silence in the face of an attempt at proof of loss (or notice of claim) waives *all other* contractual defenses. *Cf. Aetna Ins. Co. of Hartford v. Powers*, 190 Okla. 116, 121 P.2d 599, 602 (1942) (*per curiam*).

■ Second, unlike the insurers in *Reynolds* or *Haley*, HIC did not represent to the City that receipt of a notice of loss letter would lead to coverage. *See Reynolds*, 97 A.2d at 126–27; *Haley*, 749 F.Supp. at 570 ("the undisputed facts reveal that Continental treated the insureds for three and a half years *as if they were covered under the policy*") (emphasis added); *id.* ("letters from the [insurer] perpetuated the assumption that the insureds were covered").

Third, the time at which facts supporting the faulty workmanship exclusion defense became salient to the City undercuts the argument that HIC was under an implied good faith duty to seasonably communicate to the City its actual or constructive knowledge of that defense. The City knew that faulty workmanship was the primary cause of the weld failures at least as early as March 28, 1999 (before HIC could reasonably have investigated the welds). Thus, this case is not an instance where the insurer's superior knowledge of

certain facts, or ability to obtain knowledge of certain facts, would create a preliminary duty to disclose information to the other party.

Finally, in contrast to *Cleveland* and other "duty to defend" cases, HIC's extended silence did not jeopardize the City's ability to protect its rights under the policy. The HIC policy contains no duty to defend clause or covenant barring the insurer from freely protecting its rights.[17] Moreover, the City controlled the insured property, and thereby maintained the ability to freely conduct investigations and preserve relevant evidence.

HIC's delay in asserting the faulty workmanship exclusion defense violated no implied good faith duty.

### iii. *Section 4724 of the Vermont Insurance Trade Practices Act*

Finally, the City reads section 4724 of the Vermont Insurance Trade Practices Act ("VITPA"), Vt. Stat. Ann. ("V.S.A.") tit. 8, § 4724, to require HIC to seasonably deny coverage. Section 4724 of VITPA provides, in relevant part:

> **§ 4724. Unfair methods of competition or unfair or deceptive acts or practices defined**
>
> The following are hereby defined as unfair methods of competition or unfair or deceptive acts or practices in the business of insurance: . . .
>
> (9) **Unfair claim settlement practices.** Committing or performing with such frequency as to indicate a business practice any of the following: . . .

---

**16.** Indeed, no proof of loss statement was ever sought or filed in this case, nor is the faulty workmanship defense based on the sufficiency of notice that HIC received.

**17.** On this issue, it seems telling that as early as October 29, 1999, the City pursued breach of contract claims against Zurn in a suit filed in state court (and later removed, *see City of Burlington v. Zurn Indus., Inc.*, No. 99–CV–404 (D. Vt. filed Dec. 30, 1999)).

(B) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; ...

(E) failing to affirm or deny coverage of claims within a reasonable period of time after proof of loss statements have been completed; ...

8 V.S.A. § 4724 (1993).[18] The VITPA also declares that "[n]o person shall engage in any trade practice which is determined to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance," 8 V.S.A. § 4723, and vests power in the VDBISHCA Commissioner to enforce administrative sanctions for violations of the Act, including civil fines and the revocation or suspension of business licenses, *see* 8 V.S.A. § 4726(b).

The Vermont Supreme Court has held that "[a]lthough the [VITPA] ... provides administrative sanctions for unfair and deceptive acts within the insurance industry, including for unfair claim settlement practices, ... the Act does not create a private right of action." *Larocque v. State Farm Ins. Co.*, 163 Vt. 617, 660 A.2d 286, 288 (1995) (entry order) (citing *Denis Bail Bonds, Inc. v. State*, 159 Vt. 481, 622 A.2d 495, 499 (1993), and *Wilder v. Aetna Life & Cas. Ins. Co.*, 140 Vt. 16, 433 A.2d 309, 310 (1981)). Thus, if an insurer regularly fails to respond promptly to notice of claim letters, it may have committed an unfair trade practice as defined in section 4724(9) of VITPA. The appropriate remedies are

entirely administrative, however, not civil.[19]

b. *HIC's April 2000 Letter to the City Did Not Waive Any Coverage Defenses*

By letter dated April 19, 2000, HIC (through its appointed representative, Risk Management Enterprise Limited) acknowledged receipt of a letter from the City dated March 29, 2000, pertaining to a claim involving the economizer tubes at the McNeil Station. *See* Paper 165, Ex. N. HIC's letter also stated, in relevant part, as follows:

Please be advised that this letter is written under full reservation of rights and without waiver of or prejudice to any defenses which The HIC Insurance Company ("The HIC") may have under any sections of the policies and their endorsements, whether under the limited facts presently known or as may hereafter be developed. This reservation of rights includes, but is not limited to, the reasons of late notice, apparent repairs prior to any inspection by The HIC, non-compliance with the time to bring legal action and possibly no covered cause of loss during the 1/20/84 to 1/20/85 policy periods. This reservation of rights includes, but is not limited to, the right to decline coverage under any of the provisions, endorsements or exclusions of the policies, whether presently known or hereafter discovered and

---

**18.** *See also* Vermont Department of Banking, Insurance, Securities and Health Care Administration ("VDBISHCA") Regulation 79–2, § 6A (2001) ("Within fifteen (15) working days after receipt by the insurer of properly executed proofs of loss, the first party claimant shall be advised of the acceptance or denial of the claim by the insurer.").

**19.** Support for this conclusion may also be found in *Johnson v. Kentner*, 71 Or.App. 61, 691 P.2d 499 (1984), where the court held that Oregon Administrative Rule 836–80–235, which reads similar to the VITPA, may not serve as a basis for an estoppel, since that "not only would enlarge plaintiff's rights, but essentially would create a judicial remedy not contemplated within the statutory scheme." *Id.* at 507.

whether addressed in this letter or otherwise.

*Id.*

Under Vermont law, waiver is the intentional relinquishment of a known right and involves both knowledge and intent. Under this standard, HIC's letter cannot be construed as a waiver of its rights to assert policy defenses during litigation.

First, the letter lists several reasons for non-coverage while reserving all other rights and defenses. *Cf. Vermont Ins. Mgmt., Inc. v. Lumbermens' Mut. Cas. Co.,* 171 Vt. 601, 764 A.2d 1213, 1215 (2000) (no coverage exclusions were waived under terms of nonwaiver agreement which provided that the insured's defense would be undertaken "without waiver of any right or admission of any obligation under the policies"); *Haley,* 749 F.Supp. at 569 (insurer's letter which "emphasizes at the beginning that '[w]e are still reviewing all of the facts constantly being presented in this complicated case in which suits and cross suits abound' ... is clear in its attempt to give the insureds preliminary information without sounding as if coverage were guaranteed"); *Cummings, supra* (no defenses are waived when certain bases for coverage denial are expressly raised and all others are expressly reserved).

Second, although HIC's letter indicates a likelihood of its denying coverage on certain grounds—none of which include the faulty workmanship provision—it also reserves the right to defend on the basis of all other policy defenses, whether raised in the letter or not. *Compare Cummings,* 148 A. at 487 ("He may refuse to pay on a particular ground reserving the right to defend on other grounds [without waiving any defenses.]"), *with Armstrong v. Hano-*

*ver Ins. Co.,* 130 Vt. 182, 289 A.2d 669, 672–73 (1972) (insurer's letter specifying sole reason for denying coverage and which "gave no indication whatever ... that it reserved, or desired to reserve the right, to raise any reason for denying coverage" was insufficient to avoid waiver of defenses not raised in letter).

Third, there is no evidence of any conduct by HIC that is inconsistent with an intent to preserve all defenses. *Cf. Beatty,* 168 A. at 923 (estoppel found where insurer, without effectively reserving its rights under the policy, "takes charge of and defends an action against the insured"); *Jefferson Ins. Co. v. Travelers Ins. Co.,* 159 Vt. 46, 614 A.2d 385, 388 (1992) (waiver found where "after its demand for greater contribution toward either defense of the case or the settlement award was refused by [insured], [insurer] agreed to contribute the full amount of its policy limit").

■ Finally, although Vermont disfavors unilateral reservation of rights letters, *see Am. Fidelity Co. v. Kerr,* 138 Vt. 359, 416 A.2d 163, 165 (1980), acquiescence by the insured may be impliedly found where, as in this case, the insured does not object to the reservation of rights, *see Beatty,* 168 A. at 924.

c. *The Faulty Workmanship Defense Precludes Coverage Under the All Risks Policy*

The faulty workmanship exclusion contained in HIC's All Risks Policy is similar to that found dispositive in the Protection Mutual Policy. Accordingly, consistent with the reasoning set forth in the Protection Mutual portion of this Court's opinion, *supra,* the Court finds no coverage under the HIC All Risks Policy.[20]

---

**20.** The Court also concludes that any claims for consequential damages are barred by the Policy's exclusions for loss or damage "caused by or resulting from" "delay," "loss of market," or "interruption of business or other consequential loss extending beyond di-

### D. *Indemnity and the City's Cross-Motions for Summary Judgment*

#### 1. *The Indemnity Policies*

Indemnity issued two "all risk" policies to the City. The first policy has effective dates of August 25, 1995 to August 25, 1998. The second policy has effective dates of August 25, 1998 to August 25, 2001. Both policies insure "against risks of direct physical loss or damage to the property insured by the perils insured." Paper 139, at ¶ 3 & Ex. A. Both policies contain the following clause:

> This Policy does not insure loss, damage or expense caused directly or indirectly by any of the following. Such loss, damage, or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

> \* \* \* \* \* \*

> 9. Corrosion, rust, decay, depletion, deterioration, erosion, evaporation, inherent vice, latent defect, leakage, loss of weight, marring or scratching, bulging, gradual cracking, shrinkage, wear and tear, wet or dry rot or any quality in property which causes it to damage or destroy itself.

*Id.* at ¶ 4, 168 A. 919 & Ex. A.

#### 2. *Discussion*

The City challenges the efficacy of Indemnity's defenses on grounds of waiver or estoppel. As with HIC, however, there is no evidence to support a finding of waiver or estoppel. Moreover, the "latent defect" exclusion precludes coverage for the costs incurred to repair or replace the defective and leaking welds in the boiler.

##### a. *Waiver or Estoppel*

###### i. *Background*

As with the other Defendants in this case, the City mailed an October 15, 1999 notice of claim letter to Indemnity. On January 7, 2000, Indemnity's claims adjuster, Dean Beiser, responded by explaining that his review of the matter "finds coverage for this loss is in question due to potential application of policy exclusions." Paper 174, Ex. P. The Beiser response also directly quoted sections of the policy, including the exclusion for loss or damage caused by "inherent vice," "latent defect," or "any quality in property which causes it to damage or destroy itself." *See id.* The letter also explained that

> the date of loss occurrence has not been substantiated as having arisen within our policy period that commenced on August 25, 1995 and remains in force. Additional claim investigation will be needed to ascertain the cause of loss, establish the potential application of policy exclusions, and determine the actual date of this loss. Due to coverage issues present, that investigation will proceed with ... Indemnity ... reserving all rights and defenses it has in conjunction with [the two all risk policies].

*Id.* The letter closed with the following sentence: "Again, with this letter the Indemnity Insurance Company of North America reserves all rights and defenses, waiving none, under the policy and at law." *Id.*

On March 28, 2000, the City wrote Mr. Beiser inquiring about the status of Indemnity's investigation and coverage determination. *See* Paper 167, Ex. 11. On April 13, 2000, the City's attorney wrote a letter to Mr. Beiser, stating:

---

rect physical loss or damage to the property insured hereunder ...." *Cf. Witcher Constr. Co. v. Saint Paul Fire & Marine Ins. Co.,* 550 N.W.2d 1, 6 (Minn.Ct.App.1996). These exclusions were adequately raised in Paragraph 28 of HIC's Answer (Paper 26).

Enclosed please find a copy of the results of the radiographic inspection by Vermont Nondestructive Testing, Inc. of the middle and upper sections of the economizer at the McNeil Generating Station in Burlington, Vermont. As this inspection indicates, the extent of the problem with the economizer is no longer limited to the lower section and is far greater than originally believed. Accordingly, the City of Burlington Electric Department ("BED") now makes another claim under its insurance policies regarding the middle and upper sections of the economizer to the extent its original claim may not have included these sections.

Paper 174, Ex. M.

On April 17, 2000, Bieser replied, acknowledging the City's additional claims and explaining that "[o]ur investigation of the coverage issues present is winding to a close with the expectation a decision will be reached on that issue within thirty days. In the meantime, the Indemnity Insurance Company of North America continues to reserve all rights and defenses, waiving none, under the policy and the law." Paper 167, Ex. 12. Indemnity did not make a claim determination before this lawsuit was filed on May 24, 2000.

#### ii. *Analysis*

As noted earlier, under Vermont law, waiver is the intentional relinquishment of a known right. The record presented demonstrates no intention by Indemnity to relinquish any rights or defenses.

■ First, as with HIC, Indemnity was under no contractual, statutory, or common law duty to promptly deny or affirm coverage upon receipt of the City's notice of claim.[21]

■ Second, even if Indemnity was under an obligation to affirm or deny coverage within a reasonable time, Indemnity's January 7, 2000 reply to the City's October 1999 notice of claim was not unreasonably late so as to constitute an implied waiver. As the City recognizes, the earliest date at which Indemnity possessed knowledge of the facts sufficient to deny coverage was the end of January 2000, after Indemnity had inspected the boiler. *See* Paper 167, at ¶ 30. Indemnity reserved its rights clearly and unequivocally in early January 2000, quoting several relevant policy exclusion provisions and indicating that additional investigation of the claim would be necessary.

The City also claims estoppel due to Indemnity's failure to decide coverage within the time period that Indemnity explained such coverage determination was "expected." The City maintains Indemnity's representation unreasonably delayed the commencement of this lawsuit. The Court finds the City's allegation of "delay" unsupported by the record and insufficient to support a claim of estoppel.

#### b. *The Exclusion for "Latent Defect" Precludes Coverage*

#### i. *Definition*

■ The Indemnity All Risks Policies do not insure against damages or losses caused directly or indirectly by "inherent vice" or "latent defect." Neither "inherent vice" nor "latent defect" is defined in the policy, and if either term is found to be ambiguous, they must be construed against Indemnity. *See VELCO*, 72 F.Supp.2d at 445. Indemnity will not be deprived, however, of unambiguous provisions put into its policies for its benefit.

---

**21.** As with HIC's All Risk Policy, Indemnity's Policies do not create the expectation that Indemnity will promptly communicate with the insureds when notice of claim letters are received, or that the mere filing of a claim, without more, will lead to coverage.

*See N. Sec. Ins. Co. v. Hatch,* 165 Vt. 383, 683 A.2d 392, 394 (1996).

In the ordinary sense of the term, "latent defect" means a defect that is hidden, or which could not have been discovered by any known or customary test or examination. *See Bd. of Educ. of Maine Township High Sch. Dist. v. Int'l Ins. Co.,* 292 Ill.App.3d 14, 225 Ill.Dec. 987, 684 N.E.2d 978, 982 (1997) (" 'an unknown defect ... [is] not discoverable by such inspection or test as the law reasonably requires under all the circumstances' ") (quoting *Webster's New Third International Dictionary* 1275 (1986)); *Ariston Airline & Catering Supply Co. v. Forbes,* 211 N.J.Super. 472, 511 A.2d 1278, 1283 (1986) (latent: " 'present or existing, but not manifest, exhibited, or developed' ") (quoting *Oxford English Dictionary* 1576 (Compact ed.1971)); *cf. Scott v. Continental Ins. Co.,* 51 Cal. Rptr.2d 566, 44 Cal.App.4th 24, 28–35 (Cal. Ct.App.1996) (a latent defect is an irregularity that causes weakness or failure and which is both not readily observable and not discoverable to any but the most searching inspection) (citing *Webster's Third New International Dictionary* 1275 (1979)).

Indeed, in the context of negligence lawsuits, the Vermont Supreme Court has recognized a similar definition of the term. *See, e.g., S. Burlington Sch. Dist. v. Goodrich,* 135 Vt. 601, 382 A.2d 220, 225 (1977) (Billings, J., concurring and dissenting) (action against architect and contractor for damages resulting from defective roof) ("In the case at bar, the nature of the defect or injury is inherently unknown and latent in nature.").

The majority of courts outside Vermont have found "latent defect" to be unambiguous in insurance policy provisions. *See, e.g., Winans v. State Farm Fire & Cas. Co.,* 968 F.2d 884, 885 (9th Cir.1992) (under California law, failure to remove loose soil from beneath a house during construction, which caused settling and structural damage, falls within latent defect exclusion if discoverable only through subsequent intensive expert investigation) (citing *Acme Galvanizing Co., Inc. v. Fireman's Fund Ins. Co.,* 221 Cal.App.3d 170, 270 Cal.Rptr. 405, 410 (1990)); *Tzung v. State Farm Fire & Cas. Co.,* 873 F.2d 1338, 1342 (9th Cir.1989) ("defects in construction may constitute inherent or latent defects if not readily discoverable"); *Aetna Cas. & Sur. Co. v. Yates,* 344 F.2d 939, 941 (5th Cir.1965) ("While we would resolve any ambiguity against the insurer, and agree that the language ['inherent vice'] is not a model of clarity, we do not think that any acceptable reading permits compensation for the loss that plaintiffs incurred as a result of the defective design of their home."); *Merz v. Allstate Ins. Co.,* 677 F.Supp. 388, 389 (W.D.Pa.1988) (deficiencies in construction of house, *e.g.,* basement walls that were too high, too long, too thin, and improperly backfilled, "undeniably" fall within policy exclusion for latent defects); *Neri v. Nationwide Mut. Fire Ins. Co.,* 719 A.2d 1150, 1153–54 (R.I. 1998) ("latent defect" exclusion may encompass construction defects, as well as defects in the materials used in construction, that could not be discovered by a reasonable inspection); *80 Broad Street Co. v. United States Fire Ins. Co.,* 88 Misc.2d 706, 389 N.Y.S.2d 214, 215 (N.Y.Sup.Ct.1975) (improper original construction of building found to be partial cause for buckling of marble facing on building falls within "inherent or latent defect" exclusion of policy), *aff'd without op.* 54 A.D.2d 888, 390 N.Y.S.2d 768 (N.Y.App.Div.1976); *Derenzo v. State Farm Mut. Ins. Co.,* 141 Misc.2d 456, 533 N.Y.S.2d 195, 197 (N.Y.Sup.Ct.1988) (improper or defective workmanship in construction that led to structural damage to building falls within "latent defect" exclu-

sion to policy); *see also Bd. of Educ. of Maine Township,* 225 Ill.Dec. 987, 684 N.E.2d at 981–83; *Scott,* 44 Cal.App.4th at 35, 51 Cal.Rptr.2d 566; *Chubb Group of Ins. Companies v. Guyuron,* No. 68468, 1995 WL 739618, at *5 (Ohio Ct.App. Dec. 14, 1995); *Puckett v. State Farm Fire & Cas. Co.,* 546 So.2d 354, 355 (La.Ct.App. 1989); *Ariston Airline,* 511 A.2d at 1283. *Cf. Dow Chemical Co. v. Royal Indem. Co.,* 635 F.2d 379, 390 n. 12 (5th Cir. Unit A Jan.1981) ("[W]ithin the meaning of a policy insuring against negligence in welding, defective welding is not a 'latent defect'.") (citing *Gen. Am. Transp. Corp. v. Sun Ins. Office, Ltd.,* 369 F.2d 906, 908 (6th Cir.1966) (*per curiam*)); *but cf. Plaza Equities Corp. v. Aetna Cas. & Sur. Co.,* 372 F.Supp. 1325, 1331 (S.D.N.Y. 1974).

Despite its apparent clarity, some courts found "latent defect" ambiguous and construed the ambiguity in favor of the insured. *See, e.g., Markham v. Nationwide Mut. Fire Ins. Co.,* 125 N.C.App. 443, 481 S.E.2d 349, 356–57 (1997) ("[A] latent defect exclusion, absent a contrary definition in the policy, encompasses only an 'inherent defect in the materials used in construction which could not be discovered by any known or customary test and do[es] not include faulty design or construction ....'") (quoting *Mattis v. State Farm Fire & Cas. Co.,* 118 Ill.App.3d 612, 73 Ill.Dec. 907, 454 N.E.2d 1156, 1162 (1983)); *see also Essex House v. St. Paul Fire & Marine Ins. Co.,* 404 F.Supp. 978, 991 (S.D.Ohio 1975) ("latent defect" means defects inherent in the materials used, and does not include negligent design and construction); *cf. Standard Structural Steel Co. v. Bethlehem Steel Corp.,* 597 F.Supp. 164, 195 (D.Conn.1984) ("inherent quality or defect" exclusion inapplicable; the primary causative agent of damage, negligence in constructing the insured property contrary to engineering specifications, "did not emanate from an inherent vice in the property itself, but from without").

Given the strong trend of authority, however, this Court declines to conclude that the Vermont Supreme Court would find the term "latent defect" ambiguous within the context of Indemnity's All-Risks Policies.

ii. *Defects In the Welds Were Not Discoverable Upon Known and Customary Inspection*

■ It would not have been reasonable or customary for Indemnity to conduct intensive, expert investigations or analyses of the boiler welds during August of 1995 or August of 1998, the dates on which Indemnity assumed the risks under its two policies. *See* 21 V.S.A. § 242 (2001 Supp.); *cf. Winans,* 968 F.2d at 885; *Acme Galvanizing,* 270 Cal.Rptr. at 410; *Tzung,* 873 F.2d at 1342; *Maine Township,* 225 Ill. Dec. 987, 684 N.E.2d at 983; *Chubb Group,* 1995 WL 739618, at *5. As explained by David N. French, the City's metallurgical expert:

> Unless there are compelling reasons for a plant manager to believe that the welds of a boiler or economizer system lack full penetration, he or she would just repair leaks as they occur without testing leaking welds to determine the cause of the leaks. Absent such compelling reasons, he or she would certainly *not test* other welds that had not yet leaked. No such compelling reasons existed at the McNeil Generating Station in 1987 or 1988, *or at any time until recently.*
>
> Two isolated failures out of the 518 shop welds in the lower section of the ... economizer demonstrates a defect rate of slightly more than one third of one percent (0.3861%) at that time. An apparent defect rate of this magnitude is insignificant and well within quality con-

trol parameters for the industry. Such a defect rate would not have warranted testing of the remaining shop welds of the lower section at that time because their integrity would not have been questioned. *Only when the weld failures reached epidemic proportions during the late 1990s would the integrity of the remaining shop welds of the lower section be called into question.* Paper 95, Ex. N, at ¶¶ 6–7 (emphasis added). *See also* Paper 167, Ex. 14, at 67–68 (deposition testimony of John Irving, Superintendent of the McNeil Plant) (weld failure rate did not warrant intensive testing until winter of 1998).[22]

Two isolated leaks were discovered in boiler welds in 1987 and 1988, and contractors were hired to repair those welds. In neither instance, however, did the welding contractors determine that the weld defects were the cause of the leaks. *See* Paper 95, Exs. L & M. Indeed, according to John Irving, the City's superintendent for the McNeil Plant since 1985, the certified welding contractors that repaired and inspected faulty welds over the *life* of the plant never reported that the welds suffered pervasively from defects created by Zurn's faulty workmanship. *See* Paper 95, Ex. K, at 47; *see also* Paper 165, Ex. F, at 32; Paper 133, Ex. F.

Since the underlying cause of the weld failures was not discovered on the dates that Indemnity assumed the risk, and since the City's entire theory of liability in this case is derived from its own experts' radiographic and metallurgical analyses, the conclusion must be that the defects were "latent defects" within the scope of the policies' exclusions.[23]

### E. Hartford's Motion for Summary Judgment and the City's Partial Motion For Summary Judgment

#### 1. Hartford's Policies

Defendant Hartford issued four successive property insurance policies to NEP-PA, effective January 20, 1990 through October 4, 1995. The McNeil Plant was listed in the Policies as an insured property and the Policies insured "against all risks of direct physical loss or damage to

---

22. Moreover, the sort of investigations and tests performed by French and other experts in 1999 and 2000 are not "known and customary" because they would impose unreasonable burdens as a practical matter. *Cf. Derenzo,* 533 N.Y.S.2d at 197 (defective workmanship defects not discovered by building contractor or the party in direct control of the contractor's performance constitute latent defects, since "[t]o hold otherwise ... would impose an enormous burden upon [the insurer] to continually inspect an ongoing construction project for defects"); *Univ. of Vermont ("UVM") v. W.R. Grace & Co.,* 152 Vt. 287, 565 A.2d 1354, 1357–58 (1989) (citing and quoting with approval *S. Burlington Sch. Dist. v. Goodrich,* 135 Vt. 601, 382 A.2d 220, 225 (1977) (Billings, J., concurring and dissenting)). Indeed, French's reports were performed on the basis of inspections of weld samples that had been *cut out and removed* from the boiler during a planned plant shut down, *see* Paper 95, Ex. J, at 1–2, and even

relatively brief periods of plant shut down are evidently quite costly, *see* Paper 95, Ex. K, at 25–26.

23. As noted earlier, Indemnity expressly quoted the "latent defect/inherent vice" exclusion in its January 2000 reservation of rights letter, indicating that it was a possible basis for denying coverage. The latent defect exclusion provision was also quoted in an affirmative defense contained in Indemnity's Answer (Paper 24) to the City's Amended Complaint. Therefore, the Court concludes that the "latent defect/inherent vice" defense was adequately raised. In addition, because the Indemnity policies only insure "against risks of direct physical loss or damage to the property insured by the perils insured," the Court concludes that any claims for consequential damages, including lost opportunity, replacement power costs, or cost to re-fire the boiler, are not within the scope of the policies' coverage. *See* Paper 24, at 6 (third and fourth defenses).

Property Insured from perils not otherwise excluded ...." Paper 133, Ex. A. Under the "EXCLUSIONS" heading, the Policies each provided, in relevant part, as follows:

This Policy does not insure against:

1. any defect or fault in material, workmanship, or design....

This exclusion shall not apply to the mechanical or electrical breakdown of:

a. any boiler, pressure vessel, refrigerating system or any piping and accessory equipment or;

b. any electrical or mechanical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power ....

\* \* \* \* \* \*

5. ... inherent vice, latent defect ....

*Id.* The Policies did not provide definitions for the terms "mechanical breakdown," "inherent vice," or "latent defect."

### 2. *Procedural History*

On October 15, 1999, the City, through its insurance broker, Global Risk Associates, Inc., wrote to Hartford seeking coverage for the loss due to the leaking economizer. *See id.*, Ex. B. On October 26, 1999, Hartford responded in part as follows:

As you are clearly aware, it has been many years since Hartford ... insured the City .... If the loss to the economizer is recent, then that claim will be denied because there is no insurance. If the damaged economizer became evident while our policy was in force, then I must reserve my rights due to delayed notification. By reserving my rights, I am neither denying nor accepting liability; rather, just clarifying that I intend to exercise every right and privilege due to HSB under the terms and conditions

of the appropriate policy, that policy yet to be determined.

*Id.*, Ex. C.

On December 13, 1999, Hartford wrote to the City, explaining that in light of its investigation of November 18, 1999, and the information it learned concerning the timing of leaks or damage experienced by the economizer, it was denying coverage for failure to receive written notice and proof of loss from the City "as soon as practicable" after the occurrence of an insured loss or damage. *See id.*, Ex. E. The final paragraph of the letter stated:

This letter should not be regarded as exhaustive or complete with respect to the coverage issues which might ultimately be shown to exist in connection with this claim. Rather, HSB reserves its right to deny coverage based on any of the policy's terms, conditions or exclusions, and to assert any defenses provided by the policy or law, whether identified in this letter or not.

*Id.*

On December 28, 1999, the City, through its attorney, wrote to Hartford, "urg[ing] [Hartford] to reconsider [its] decision to deny coverage," given that the City "did not discover the fact that the welds were faulty until March 1999. [The City] became aware of the faulty nature of the welds only through the efforts of David N. French, Metallurgists, which issued a report, dated March 30, 1999, outlining its findings regarding the welds." *Id.*, Ex. F. The letter also disputed the contention that the loss "occurred" in 1983, observing that "Vermont law" on the issue of insurance coverage triggers "is far from settled." *Id.*

On February 29, 2000, the City's attorney wrote to Hartford, seeking a response to the December 28, 1999 letter, "[s]ince a continued denial of coverage based upon incorrect facts would be unreasonable and

detrimental to your company's interests." *Id.* On March 20, 2000, Hartford responded to the City's December 28, 1999 letter, re-asserting the "notice of loss" argument by explaining that

> [t]he policy requires that the insurer be given notice upon the occurrence of loss or damage that may be covered under the policy and not when the Insured ultimately determines the cause of the loss or damage. Thus, the applicable date with respect to this claim was when the leaks occurred on the economizer.

*Id.,* Ex. G. The letter concluded with the statement that Hartford "reserves its right to deny coverage based on any of the policy's terms, conditions or exclusions, and to assert any defenses provided by the policy or law, whether or not identified in this or any other letter." *Id.*

By correspondence dated April 3, 2000, the City's attorney responded, pointedly asserting that the defense for "late notice" was meritless regardless of the date the loss "occurred" under the policies because Hartford had demonstrated no proof of substantial prejudice in connection with the late notice. *See* Paper 154, Ex. 21. The letter also complained that Hartford had ignored repeated requests to provide the City with copies of the applicable Hartford policies. *See id.* No response was given to this letter, and the City's lawsuit against Hartford and other insurers was filed on May 24, 2000.

### 3. *Discussion*

 The "latent defect" exclusion was adequately preserved for use in litigation by virtue of Hartford's letters of October 26, 1999, December 13, 1999, and March 20, 2000, each of which either reserved the right to deny coverage on certain specified grounds while reserving all other rights under the terms and conditions of the policies.[24] For the reasons set forth in the Court's discussion concerning Indemnity's "latent defect" exclusion, *supra,* the Court finds that coverage is similarly precluded by Hartford's "latent defect" exclusions.[25]

 The Court also finds the City's bad faith claim meritless. To establish a claim for bad faith in Vermont, the City must prove

> that (1) the insurance company had no reasonable basis to deny benefits of the policy, and (2) the company knew or recklessly disregarded the fact that no reasonable basis existed for denying the claim. *See Lauzon v. State Farm Mut. Auto. Ins.,* 164 Vt. 620, 621, 674 A.2d 1246, 1247 (1995); *see also Bushey v. Allstate Ins. Co.,* 164 Vt. 399, 402, 670 A.2d 807, 809 (1995). An insurance company may challenge claims that are debatable and will be found liable only where it has intentionally denied a claim without a reasonable basis. *See Bushey v. Allstate Insurance Co.,* 164 Vt. 399, 402, 670 A.2d 807, 809 (1995) (citing *Anderson v. Continental Ins. Co.,* 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978).) Vermont's bad faith rule "limits recovery to instances in which an insurer not only errs in denying coverage but does so unreasonably." *Id.* 164 Vt. at 402, 670 A.2d at 809.

*Davis v. Liberty Mut. Ins. Co.,* 19 F.Supp.2d 193, 202 (D.Vt.1998); *see also Bushey,* 670 A.2d at 809 ("Thus, if a realistic question of liability exists, an insurer may withhold payment while it determines whether there is a reasonable basis for the

---

**24.** And though not the subject of extensive briefing, the "latent defect" exclusion was adequately raised as a defense in Hartford's Answer. *See* Paper 13.

**25.** The Hartford Policies' exclusion for "Business Interruption; delay or loss of market" (Paper 133, Ex. A) precludes the City's claims for consequential damages. *See* note 9, *supra.*

claim or amount demanded."). "The question of whether an insurer acts in bad faith depends on the specific facts of each case, and is one for the trier of fact." *Myers v. Ambassador Ins. Co.*, 146 Vt. 552, 508 A.2d 689, 692 (1986) (internal citation omitted). "Nonetheless, such determination becomes a question of law when from uncontroverted evidence a reasonable man following the law can draw but one conclusion." *Id.*

Here, Hartford did not behave unreasonably in specifically denying coverage on grounds that the City failed to comply with the Policies' notice of loss provisions. In addition, no reasonable jury could conclude Hartford was unreasonable in believing that it was prejudiced by the City's failure to notify Hartford of a potential claim prior to the removal and repair of more than 30 defective welds. The City fails to present evidence suggesting that Hartford did not suffer substantial prejudice in connection with the timing of the notice of loss or that Hartford knew or recklessly disregarded the fact that substantial prejudice was lacking.

## IV. *Conclusion*

For the reasons set forth above, it is hereby **ORDERED**, that Defendant Factory Mutual Insurance Company's Motion for Summary Judgment (Paper 90) is **GRANTED**; Defendant Allianz Insurance Company's Motion for Summary Judgment (Paper 92) is **GRANTED**; Defendant The Home Insurance Company's Motion for Summary Judgment (Paper 119) is **GRANTED**; Defendant Indemnity Insurance Company of North America's Motion for Summary Judgment (Paper 137) is **GRANTED**; Defendant Hartford Steam Boiler Inspection and Insurance Company's Motion for Summary Judgment (Paper 130) is **GRANTED**; and Plaintiff City of Burlington's Motions for Summary

Judgment against each Defendant (Papers 122, 124, 141, 166 and 153) are **DENIED**.