Docket No. 02–7691.

United States Court of Appeals,
Second Circuit.

Argued: March 5, 2003.
Decided: Sept. 29, 2003.

CITY OF BURLINGTON,
Plaintiff–Appellant,

v.

INDEMNITY INSURANCE COMPANY OF NORTH AMERICA, Defendant–Appellee,

William F. Ellis, Kevin J. Coyle, McNeil, Leddy & Sheahan, Burlington, Vt., for Plaintiff–Appellant.

Thomas S. Brown, Andrew S. Granzow, Hecker Brown Sherry and Johnson LLP, Philadelphia, PA, for Defendant–Appellee.

Before: CALABRESI and SACK, Circuit Judges, and PAULEY,* District Judge.

CALABRESI, Circuit Judge:

Between 1996 and 2000, the City of Burlington (the "City") held two all-risk poli-cies that insured a power generator with Indemnity Insurance Company of North America ("Indemnity"). During the peri-od of coverage, approximately thirty-three welds on the generator's boiler developed leaks as a result of intrinsic defects. In-demnity disclaimed coverage for the defec-tive and failed welds, and the City brought suit in the United States District Court for the District of Vermont. The district court (Murtha, *C.J.*) held that the defective and failed welds were not covered because the City's policies excluded losses caused by a "latent defect." We conclude that, under Vermont law, a paragraph of the City's policies that excluded from coverage losses due to "latent defect" and various other listed internal causes applied to the failed welds, and we therefore affirm.

## BACKGROUND [1]

In 1982, the City contracted with Zurn Industries, Inc. to design, engineer and construct a wood-fired steam electricity generator. The boiler portion of the gen-erator included an economizer, which con-sisted of metal tubes welded together. These "shop welds" were performed at the manufacturing facility prior to delivery.

In 1987 and 1988, the City discovered two isolated leaks in shop welds on the lower section of the economizer. The rec-ord before us indicates that this number of leaks was not enough to cause concern. No more leaks were found until April 1995. Between 1995 and August 1999, however, the City discovered and repaired thirty-four additional leaks on the lower econom-izer.

The City hired David N. French to study the economizer and determine the

---

* The Honorable William H. Pauley III, United States District Judge for the Southern District of New York, sitting by designation.

1. For the convenience of the reader, we in-clude the factual summary contained in our earlier opinion in this case. *See City of Bur-lington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 41–43 (2d Cir.2003).

cause of the leaks. French performed radiographic/metallographic analysis on two weld samples that had been removed from the boilers. In March 1999, he reported that the original welds were substandard, finding "a lack of full penetration which means the weld does not comply with [American Society of Mechanical Engineers] requirements." Later that same month, the City contracted with Power Specialist Associates, Inc. (PSA) to perform ultrasonic thickness testing. Like French, PSA concluded that "it appeared that the failure was caused by a lack of root weld penetration, which would cause a relatively weak area in the tube."

In October 1999, the City decided to remove and replace all existing shop welds on the lower economizer, including those that, to date, had shown no signs of leaking. Its contractor, Bremco, concluded that "[c]areful inspection of the removed welds revealed incomplete penetration at every joint." In the spring of 2000, the City contracted with Vermont Nondestructive Testing for non-invasive radiographic inspection of the center and upper portions of the economizer; these investigations also indicated pervasive weld defects.

Between August 25, 1995 and August 25, 2001, the boiler unit was insured with Indemnity. Thirty-three of the thirty-four leaks occurred during this period. The two three-year policies covering those years (the "Policies") were in all relevant respects identical. Both were "all-risk" policies, which is to say that they insured against all risks unless explicitly excluded, and both covered "risks of direct physical loss or damage to the property insured." The Policies also contained an "Excluded Causes of Loss" section, which contained, inter alia, the following coverage limitations:

This Policy does not insure loss, damage or expense caused directly or indirectly by any of the following. Such loss, damage, or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

. . . .

9. Corrosion, rust, decay, depletion, deterioration, erosion, evaporation, inherent vice, latent defect, leakage, loss of weight, marring or scratching, bulging, gradual cracking, shrinkage, wear and tear, wet or dry rot or any quality in property which causes it to damage or destroy itself.

. . . .

14. Cost of making good;
A. Error, omission or deficiency in design, plans, specification engineering or surveying;
B. Faulty or defective workmanship, materials and supplies;

This exclusion shall not apply to the mechanical breakdown of:

(1) any boiler, pressure vessel, refrigerating system or any piping and accessory equipment or;

(2) any electrical or mechanical machine or apparatus used for the generation, transmission or utilization of mechanical or electrical power;

which has been installed, fully tested and contractually accepted by the Named Insured and which is being or has been operated at the insured location, in the capacity for which it was designed, as part of the Named Insured's normal production process or processes.

On October 15, 1999, the City mailed Indemnity a notice of claim letter, which specified as the loss the faulty welds on the lower section of the economizer. Indemnity replied on January 7, 2000 that its

review of the matter found coverage to be "in question" due to the Policies' exclusions, including those for "inherent vice," "latent defect" and "any quality in property which causes it to damage or destroy itself." The letter expressly reserved all rights and defenses.

On April 13, 2000, the City made an additional claim for the middle and upper sections of the economizer. On April 17, Indemnity replied that its investigation was winding to a close and a decision on the City's claims would be reached within thirty days. Indemnity had not yet made a claim determination on May 24, 2000, when this lawsuit was filed in the United States District Court for the District of Vermont.

The City's complaint sought damages from five separate insurance companies, each of which had insured the generator at one time or another between its installation and the initiation of the suit. The defendants each moved and the City cross-moved for summary judgment. The district court analyzed the policies separately and concluded, for different reasons in each case, that none covered the City's claimed losses. *See City of Burlington v. Hartford Steam Boiler Inspection and Ins. Co.*, 190 F.Supp.2d 663 (D.Vt.2002). The City appeals only the ruling on the Indemnity Policies.

The court held that coverage was precluded by the Policies' "inherent vice" and "latent defect" exclusions.[2] It focused on the term "latent defect," which the Policies did not define and which Vermont courts have yet to consider in the context of an all-risk insurance policy. The district court observed that, though some courts have deemed the term ambiguous and therefore construed it in favor of the insured, a majority of courts outside of Vermont have found the term to be unambiguous. *Id.* at 688–89 (citing cases). It concluded that, given the "strong trend of authority," the Vermont Supreme Court would not find the term ambiguous within the context of Indemnity's all-risk policy and would read that term to mean "a defect that is hidden, or which could not have been discovered by any known or customary test or examination." *Id.* at 688–89. The court held that the flaws in the welds were not discoverable upon known and customary inspection, were therefore latent defects, and consequently were excluded from coverage. *Id.* at 689–90.[3]

The City subsequently moved to alter or amend the judgment and for reconsideration, on the grounds that reconsideration was appropriate since Indemnity had not argued the "latent defect" exclusion in moving for summary judgment and because that term was in fact ambiguous. In a decision dated May 10, 2002, the trial court granted the motion for reconsideration and, without further explanation, declined to alter its ruling. The City appealed to this Court, and, on June 9, 2003–

---

2. In analyzing whether the faulty and failed welds were covered by the Indemnity Policies, the district court also rejected the City's argument that Indemnity had waived or was estopped from raising its defenses. *Id.* at 686–87. The City does not appeal this ruling.

3. The district court also stated in a footnote that "any claims for consequential damages, including lost opportunity, replacement power costs, or cost to re-fire the boiler, are not within the scope of the policies' coverage."

*Id.* at 690 n. 23. The City objects that at least some such damages were covered by an extension of coverage contained in the Policies and that Indemnity failed to plead in its answer any limitation to damages, thereby waiving that defense. Because we do not today decide whether the failed welds were covered by the Policies, we do not reach the question of whether, if they were covered, the City would be due consequential damages.

after extensive analysis of the legal issues involved-we certified the following two questions to the Vermont Supreme Court:

Under Vermont law, does an all-risk insurance policy cover unforeseen losses that are not externally caused, where the policy does not explicitly exclude such loses from coverage?

Assuming an affirmative answer to the first question, did paragraph 9 of the "Excluded Causes of Losses" provision of the Policies suffice to limit coverage to externally caused losses and hence to exclude the failed welds from coverage?

*City of Burlington v. Indem. Ins. Co. of N. Am.*, 332 F.3d 38, 50 (2d Cir.2003). In an unpublished order filed July 2, 2003, the Vermont Supreme Court declined certification.

## DISCUSSION

■ In our earlier opinion in which we sought the views of the Vermont Supreme Court, we discussed all-risk insurance policies and, in particular, the interpretation given by various state courts of "fortuity" requirements in such policies. We then stated:

[I]f we did not have the option of certifying to the Vermont Supreme Court, we would be inclined to dispose of this case as follows. First, while Vermont courts have not yet provided an interpretation of the fortuity requirement in all-risk policies, we would predict that they would be more likely to adopt the contemporary, subjective reading of that requirement than to stay with the older, objective reading. That is, we would expect that all-risk coverage under Vermont law, while extending only to fortuitous losses, is not, as such, limited to losses that have external causes. Second, we would be inclined to read Paragraph 9 as opting-out of this interpretive default and excluding intrinsically

caused losses from the Policies' coverage. Because it is not disputed that the cause of the leaking welds was a lack of full penetration in the welds themselves, rather than any external cause, we would therefore tend toward the conclusion that the Policies did not cover the failed welds.

*Id.* In other words, we made quite clear what we believed, drawing primarily on the law of other states, Vermont law to be. We did this because, while we wanted to give Vermont and the parties the opportunity to have Vermont law determined authoritatively by the Vermont high court, we did not wish to impose unnecessary burdens on that court.

In a sense, we were creating a situation analogous to that occurring when an intermediate state appellate court issues a ruling that can be reviewed by the Supreme Court of that state, but only if the Supreme Court wishes to hear the matter. We believe that in diversity cases and in other situations in which state law is determinative, it is often appropriate for federal courts to take on a role that is similar to that of an intermediate state court. By doing this, we a) increase the likelihood that the parties will have their case heard by the highest tribunal of the state whose law applies, and b) affirm that it is the state's High Court that is entitled to have the final say on any issue of state law. We do this, however, subject to the state Supreme Court wishing to accept the case.

And the latter is most important, for we would be hesitant to certify were certification to be perceived as pressuring the state's High Court to take the case even if, due to an overloaded docket or for any number of other reasons, that court preferred not to. By indicating the likely outcome if certification were not accepted, we intended to make it easier for the Vermont Supreme Court to determine, in

its full discretion, whether to decline certification.[4] The Supreme Court having now done so, we can freely apply our view of Vermont law to the case at hand.

After due deliberation, we adhere to the position expressed in our certifying opinion that a) all-risk coverage under Vermont law, while extending only to fortuitous losses, is not limited to losses that have external causes, and b) Paragraph 9 of the insurance policies at issue before us was meant to opt out of this interpretative default and thus to exclude intrinsically caused losses from the policies' coverage. See City of Burlington, 332 F.3d at 50. Accordingly, we AFFIRM the judgment of the district court.

---

4. There are, of course, many reasons why a state High Court declines to review a decision of a lower state court—only one of which is that the decision appears to be correct. For example, it may be that the issue presented, though important and one that the high court would like to pass on, cannot be dealt with in the time frame in which a decision should be rendered, thereby making a review of the decision below imprudent. These considerations apply equally to a decision on whether to accept certification from a federal court. See, e.g., Tunick v. Safir, 228 F.3d 135, 137 (2d Cir.2000) (per curiam) (reporting, in a case involving a First Amendment challenge to a public nudity statute, that the New York

Court of Appeals declined certification "in the mutual interest of expeditious resolution of the preliminary injunction/prior restraint issue") (quoting Tunick v. Safir, 94 N.Y.2d 709, 709 N.Y.S.2d 881, 731 N.E.2d 597, 599 (2000)). But see Tunick v. Safir, 209 F.3d 67, 90–96 (2d Cir.2000) (Sack, J., concurring in the judgment) (arguing against certification in the case because the period of certification itself amounted to an unconstitutional restraint on the speech there in issue). Judge Sack's position in Tunick shows, particularly powerfully, that there may be reasons why certification, even when it is otherwise desirable, has its costs and may in some instances be foregone.